Edgar **LABAT** and **Clifton Alton Poret**, Appellants,

v.

Robert B. **BENNETT**, Acting Warden, Louisiana State Penitentiary, Appellee.

No. 22218.

United States Court of Appeals Fifth Circuit.

Aug. 15, 1966.

Rehearing Denied Sept. 30, 1966.

Benjamin E. Smith, Gerald H. Schreiber, G. Wray Gill, New Orleans, La., Edward Bennett Williams, Washington, D. C., for appellants.

John E. Jackson, Jr., Asst. Atty. Gen., New Orleans, La., Jack P. F. Gremillion, Atty. Gen. State of Louisiana, Baton Rouge, La., M. E. Culligan, Asst. Atty. Gen. State of Louisiana, New Orleans, La., for appellee.

Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL,

THORNBERRY, and COLEMAN, Circuit Judges.

WISDOM, Circuit Judge:

"The law hath not been dead, though it hath slept." [1]

"Death" for thirteen years has kept close tab on Edgar Labat and Clifton Poret. March 23, 1953, an all-white jury in the Criminal District Court for the Parish of Orleans, Louisiana, found Labat and Poret, the two Negro petitioners in this habeas corpus proceeding, guilty of the aggravated rape of a white woman. The jury brought in no recommendation of mercy; the defendants were sentenced to death by electrocution. Since then they have been in solitary confinement on Death Row in the Louisiana State Penitentiary. Nine times courts stayed their execution; once, less than three hours before they were to be strapped in the electric chair.

About four o'clock Sunday morning, November 12, 1950, a white woman and her escort were walking along Thalia Street in New Orleans.[2] As they approached Tonti Street, two Negroes attacked them from behind. One, a tall Negro, allegedly Labat, seized the escort by the neck and demanded money. The escort testified at the trial that "he did not see a weapon * * * [but the Negro] had his hand in his pocket as if to make [one] assume that he had a weapon". The escort handed over Ten Dollars and was released. He ran for help. Meanwhile, the other Negro, allegedly Poret, dragged the woman halfway down the street and into a dark alley between Thalia and Calliope Streets. In a few minutes the tall Negro joined him. One Negro raped the woman while the other

held her. Afterwards, they took her out of the alley and headed in the direction of an empty lot. A police car appeared; the attackers fled.

At 11 o'clock Sunday morning, on information furnished by one Earl Howard, who had been talking with two other Negroes just before the assault, police arrested Labat in his home. He has been continuously in custody since that time. Poret, whom the charging witness identified from a photograph in police files, could not be found. Some time afterwards New Orleans police located him in Tennessee serving a sentence for theft. Late in 1952 he was brought back to Louisiana to stand trial with Labat.

By appeal through the Louisiana courts to the United States Supreme Court and in habeas corpus proceedings in state and federal courts, the petitioners have consistently and unsuccessfully contended that they were denied a fair trial because of the systematic exclusion of Negroes from the jury system in Orleans Parish. Finally, the United States Supreme Court, reversing the Fifth Circuit, remanded this habeas proceeding to the district court for that court to decide whether Negroes were "limited and excluded in the selection of petit jury panels" in Orleans Parish. United States ex rel. Poret and Labat v. Sigler, 1960, 361 U.S. 375, 80 S.Ct. 404, 4 L.Ed.2d 380. After an evidentiary hearing, the district court found: since the petitioners had failed to make timely objections to the grand jury and the petit jury, "they are now deemed to have *waived* these objections"; "that disproportions which exist between the races on the jury panels in Orleans Parish have resulted * * * from a scrupulous adherence to the laws of Louisiana * * * which laws * * * are rea-

1. Shakespeare, Measure for Measure, Act II, Sc. 2.

2. They had taken a taxicab to the residence of the young woman's married sister where she had expected to spend the rest of the night. The house was on a dimly lighted corner of a run-down section of the city. They were unable to get in the house and were unable to arouse the occupants. A Negro standing nearby, Earl Howard, helped them attempt to waken the occupants. After this failed, Howard walked away. The escort then suggested that they walk several blocks to a main street to hail a taxicab. On the way they passed Howard talking with two other Negroes. The case turned on identification of the defendants. Howard was a key witness. See footnote 11.

sonable and constitutional"; there was "no proof presented here of systematic exclusion of Negroes from the jury panels in New Orleans". 234 F.Supp. 171, 179. Accordingly, the district court once again denied the petitioners' application for the issuance of a writ of habeas corpus. The petitioners appeal from that judgment. We reverse.

## I.

The district court's partial reliance on the ubiquitous fiction of waiver compels this Court to trace the petitioners' contentions through most of the twists and turns of their convoluted legal proceedings.

A. Labat and Poret filed their motions to quash the indictments November 7, 1952. *Although this was three and a half months before their trial, the petitioners have never had their day in court:* never had their day to prove that they were denied a fair trial by a jury of their peers; never, that is, until the district court held its hearing March 31, 1964, in obedience to the Supreme Court's mandate.

Each motion to quash read as follows: "That considering the Negro population of the Parish of Orleans, and the number of Negroes qualified for jury service, there had been systematic, unlawful and unconstitutional exclusion of Negroes from the *General Venire* and Grand Jury panel and Grand Jury involved in the returning of the indictment herein; that said systematic, unlawful and unconstitutional exclusion of Negroes from said units has existed continuously prior hereto for a number of years in the Parish of Orleans; that in those instances where Negroes have been included in the General Venire and Grand Jury panels referred hereto in, Negroes have been discriminated against by an arbitrary and inapportionate [*sic*] limiting of

their number by State Officials who have not sufficiently acquainted themselves with the qualifications of all potential jurors." (Emphasis added.)

■ The motion is clear enough to a Louisiana lawyer. Petit jury panels, the final venires, are derived from the proposed venire which is drawn at random from the jury wheel (*the general venire*). The motion, therefore, attacks the composition of petit juries and their venires as well as that of grand juries and their venires. The vice permeates the entire jury system; the motion attacks the system. It appears to this Court, however, on reading the old briefs and records that until the habeas action was filed in 1957, although petitioners' counsel did not abandon their attack on the general venire, they concentrated their attack on the grand jury.[3] There were several reasons for this venial sin. First, the grand jury is *selected* by the judge from its venire rather than drawn at random. Second, in October 1952 Judge William J. O'Hara of the Criminal District Court for the Parish of Orleans, making local history, quashed an indictment on the ground that Negroes had always been excluded from grand juries in Orleans Parish. State of Louisiana v. Dowels, Nos. 139, 324, Criminal District Court for the Parish of Orleans. (The case is unreported. Justice Black quotes from the opinion at length in his dissent in Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 588–589, 78 S.Ct. 970, 2 L.Ed. 2d 991, fn 4).

A review of the petitioners' tortuous ascents and descents through the courts shows that until the Supreme Court rendered its latest order in this case, 361 U.S. 375, 80 S.Ct. 404, all of the courts dealing with the jury issue treated the motions narrowly as a challenge to the grand jury. As such the challenge was vulnerable procedurally: Louisiana law required that objections to a grand jury

---

**3.** The exclusion of Negroes from the grand jury is a ground for quashing the indictment, even when there is no objection to the composition of the petit jury that finds the defendant guilty. Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Hill v. State of Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559.

be raised before the expiration of the third judicial day following the end of the grand jury's term or before trial whichever is earlier.

Judge Fred Oser, Section "C" of the Criminal District Court for the Parish of Orleans, dismissed the motions to quash, relying on Article 202 of the 1928 Louisiana Code of Criminal Procedure (LSA–R.S. 15:202). This article provides that:

"All objections to the manner of selecting or drawing any juror or jury or to any defect or irregularity that can be pleaded against any array or venire must be filed, pleaded, heard or urged before the expiration of the third judicial day of the term for which said jury shall have been drawn, or before entering upon the trial of the case if it be begun sooner; otherwise, all such objections shall be considered as waived and shall not afterwards be urged or heard."

Article 202 has always been conspicuous for its ambiguity.[4] To resolve one

4. In 1953 no one could say with any certainty what prescriptive period was provided for in Article 202. Professor Dale Bennett (L.S.U.), Coordinator for the revised Louisiana Code of Criminal Procedure just enacted by the legislature, has described Article 202 as follows: "Insofar as it relates to objections to the grand jury panel there is apparent conflict with other articles which permit the filing of objections to the indictment at any time prior to the commencement of the trial. As applied to the time for objecting to petit jury venires, it states a rule which also frequently proves unworkable. Undoubtedly the principal source of difficulty has arisen out of the attempt to set out a single rule that would govern the time for filing objections to the general venire and petit jury lists, and that would also govern the time for objecting to the composition of the grand jury as a ground for quashing indictments. * * * Article 287 declares that the demurrer and motion to quash 'must be filed, tried and disposed of before trial on the merits.' Even more latitude is apparently contemplated by the declaration in Article 253 that objections to the indictment must 'be made prior to the commencement of the trial or at such time thereafter as the court in its discretion permit.' In cases where the indictment is defective by reason of the illegal composition of the grand jury list, added confusion is injected by Article 202." Bennett, Louisiana Criminal Procedure—A Critical Appraisal, 14 La.L.Rev. 10, 17 (1953). Professor Ralph Slovenko (Tulane) has written: "A literal application of the article would in many situations render the filing of an objection impossible. * * * Article 202, as interpreted in the *Wilson* case, is applicable to objections to petit jury venires as well as to grand jury venires. State v. Chianelli, 226 La. 552, 76 So.2d 727 (1954) * * *

*As a result, the defendant has a right to file objections to the petit jury venire at any time before the trial, because the trial is never held 'after the end of' the jury term."* (Emphasis added.) Slovenko, The Jury System in Louisiana Criminal Law, 17 La.L.Rev. 655, 678 (1957). "This article * * * has been a continuous source of difficulty * * * [I]f the court were to apply the article to 'all objections to * * * *any* array or venire' (emphasis added) as its literal meaning suggests, defendants would often be denied an opportunity to challenge the legality of the jury list or venire." Ellison, Comment, Time for Urging Objections to Jury Lists and Venires, 15 La.L.Rev. 749, 754 (1955). "[T]he language of Article 202 falls far short of making clear the legislative intent * * * a defendant with *bona fide* grounds for objection, *unable to determine which article is applicable to his case or just what limit the applicable article imposes, may unwittingly allow the time for urging his objection to lapse by relying on the wrong Code article or giving it a different interpretation from that of the Supreme Court.* In its present ambiguous form this Article is one source of confusing technicalities of procedure in criminal cases which *can be used as a means of sidetracking the issue of race discrimination in the selecting of juries."* (Emphasis added.) Brash, Comment, Time To File Objections to the Drawing of Selecting of Juries, 18 Tul.L.Rev. 462, 481 (1944). In the Comments on Article 535 (former Article 202) of the Projet of the Louisiana Code of Criminal Procedure, the Reporter states: "It was the concensus of the Council that *Art. 202 of the 1928 Code provided an unworkable formula, which should be discarded. Objections to the composition and method selection of jury venires (Art. 532(9))* and of the grand jury (Art. 533(1)) can

problem, the Louisiana Supreme Court, as the Court itself said, "strained" the phrase "expiration of the third judicial day of the term" to mean the third judicial day after the expiration of the term. State v. Wilson, 1943, 204 La. 24, 14 So.2d 873.[5] "Even the *Wilson* construction of the former Article 202 would be of scant help to a defendant who did not procure counsel until after the three-day deadline had passed."[6] That is Poret's case.

In the state courts this case turned on critical dates. The grand jury that indicted the petitioners was empanelled September 5, 1950. It returned the indictment against Labat and Poret December 11, 1950. The grand jury term expired March 5, 1951. Labat was arraigned January 3, 1951; Poret was arraigned October 27, 1952. The motions to quash were filed November 7, 1952. The trial began February 24, 1953.

It was impossible for Poret to comply with Article 202. He was in a Tennessee penitentiary and did not return to New Orleans until October 3, 1952, long after the expiration of the term of the grand jury that had indicted him. During this period Poret had no attorney. Article 202 therefore was meaningless as to Poret. The Louisiana Supreme Court held, however, that an accused "cannot by any acts of his own extend the time provided for the filing of the motion."[7] Relying on State v. Wilson, the Court held that the untimely filing of the motions to quash must be treated as a waiver of objections to the grand jury.

Labat had no counsel at arraignment, January 3, 1951.[8] Two days later, the district judge appointed Mr. E. I. Mahoney as counsel to represent Labat. Thereafter the status of the case remained unchanged until January 29, 1952, when Mr. Mahoney asked and was granted leave to withdraw. Mr. G. Wray Gill, appointed in his place, contended that Labat was denied his right to effective counsel in that Mr. Mahoney was 76 or 77 years old when he took the case and was ill during several months of the year.

*only be urged by the motion to quash which must be filed before the trial commences.* However, it is desirable to adopt a liberal rule as to the time for filing a motion to quash on these important grounds. They are, therefore, listed in Paragraph B as grounds which may be urged as of right until three judicial days before the trial, and may be raised thereafter with the court's permission, until commencement of trial." (Emphasis added.) Projet, Article 535, p. 267.

5. In State v. White, 1939, 193 La. 775, 192 So. 345, however, the defendant, a fugitive for three years after his indictment, filed an objection to the grand jury and venire after his trial. It came too late, not because of the expiration of the third judicial day of the grand jury's term but because "a motion to quash the indictment may [must] be made at any time before the trial of the case." In State v. Chianelli, 1954, 226 La. 552, 76 So.2d 727, the court distinguished the grand jury term [six months] from the petit jury term [one month] and reasoned that since trial necessarily begins before the end of the petit jury term, Article 202 merely requires an accused to raise all objections to petit jury venires before trial. In State v. Butler, 1955, 227 La. 937, 81 So.2d 1 the accused challenged the petit jury venire because it was drawn from a jury wheel containing fewer than the 750 names required by law. The Court held that "it sufficed, * * * that the motion be filed before the trial of the case".

In their application to the Louisiana Supreme Court for writs of habeas corpus and coram nobis counsel for petitioners cited *Chianelli* and *Butler* as authority, subsequent to *Wilson*, for the timeliness of their motions. The Court in its unreported memorandum decision of September 27, 1957, rejected this view as "totally without substance", stating that *Butler* was based on *Chianelli* "which, in turn, is based" on *Wilson*, State v. Michel, 1954, 225 La. 1040, 74 So.2d 207 and State v. Labat, 1954, 226 La. 201, 75 So.2d 333.

6. Louisiana Law Institute, Comments on Article 535, Projet of the Louisiana Code of Criminal Procedure.

7. State v. Labat, 1954, 226 La. 201, 75 So. 2d 333, 337, 338.

8. Cf. Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114.

The Louisiana Supreme Court held that the facts did not show a lack of effective counsel.[9]

The United States Supreme Court, on its first consideration of the case, also treated the motion to quash only as an attack on the *grand jury*. Labat v. State of Louisiana and Poret v. State of Louisiana, reported with and sub nom.; Michel v. State of Louisiana, 1955, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, 92, reh. denied 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831. In the majority opinion, the Court stated:

> "*Neither [defendant] made any attack on the composition of the petit jury,* but filed motions to quash their indictments claiming discrimination in the selection of the grand-jury panel." 350 U.S. at 96, 76 S.Ct. at 162 (Emphasis added.)

The Court held that "mere fugitive status existing here [does not excuse] a failure to resort to Louisiana's established statutory procedure available to all who wish to assert claimed constitutional rights".[10] 350 U.S. at 98, 76 S.Ct. at 163. The Court accepted the findings of the Louisiana courts that Labat was represented by effective counsel.

After this rebuff, the petitioners, September 18, 1957, applied for a writ of habeas corpus in the United States District Court for the Eastern District of Louisiana. The application was based in part on newly found evidence that Howard's testimony was perjured and coerced.[11] More important for purposes of the present discussion, the petitioners' counsel clarified their challenge to the jury system. After quoting the motion to quash, the habeas application states:

> "That Your Honor has now placed before you the fact that *objection was made to both the elimination of Negroes from Grand Jury service as well as that of the GENERAL VENIRE, to-wit, the Petit Jury.* This now presents a grave and serious question." [12]

(Emphasis added.)

9. 75 So.2d at 339.

10. Chief Justice Warren and Justices Black and Douglas dissented. They concluded that Poret was denied "the opportunity, guaranteed by due process of law, to challenge the constitutionality of the composition of the grand juries that indicted them." 350 U.S. at 104, 76 S.Ct. at 166. They would have dismissed the indictment against both because the defendants were indicted jointly.

11. Howard made a sworn affidavit and later testified that his statements identifying Labat to the police and placing both Labat and Poret at the scene of the crime were a result of police pressure. In addition, one Elenora Henderson, who had not testified at the original trial, stated that she spent the entire night of November 11, 1950, with Labat; that at 2:30 a. m. he was so drunk that she was unable to arouse him even though she rubbed ice cubes over his body; that she saw police beat and kick Labat. In the habeas proceeding Judge J. Skelly Wright, trial judge, commented: "Howard appears to be a person of low mentality. Unquestionably, as the evidence shows, he has been subjected to great pressures from persons seeking to help these petitioners since his testimony in the state court. Certainly his credibility leaves much to be desired, but there is no evidence whatever, other than the statements prepared by others and signed by Howard, that Howard either committed perjury or was coerced into committing perjury. * * * [The] credibility [of the state's principal witnesses] is unchallenged except in so far as the possibility of human error is always present in the identification of persons in the circumstances [of this] in suit." Labat v. Sigler 162 F.Supp. 574, at 576.

12. Continuing, counsel stated: "The point herein referred to and made the basis of an objection in the State Court and perfected in the Supreme Court of the State apparently was not pursued in the application for writs to the Supreme Court of the United States, as the Supreme Court of the United States in its opinion did make the observation that only the qualifications of the Grand Jury or jurors had been attacked, and that the objection did not go to or refer to the Petit Jury. This should have been set forth, we respectfully submit, on motion for a rehearing before the Supreme Court of the United States as it is counsels' humble opinion that they would have maintained the writ and discharged your defendants and/or remanded the case for

Because the issue as to new evidence was not raised during the trial in the state court, the district court rejected the application for failure of the petitioners to exhaust state remedies. The petitioners then submitted the two issues to the Supreme Court of Louisiana on an application for both habeas corpus and a common law writ of error coram nobis. The Court, in an unreported order accompanied by a memorandum decision, denied the writs. State of Louisiana ex rel. Poret and Labat v. Sigler, No. 43799, September 25, 1959.[13] The petitioners applied to the United States Supreme Court for a writ of certiorari.

At the same time the petitioners were before the Louisiana Supreme Court, they carried forward their habeas proceeding in the federal courts. They appealed the district court's order and requested a stay of execution. The Fifth Circuit, September 25, 1957, in an unreported order, granted the stay but affirmed the district court. The petitioners applied to the United States Supreme Court for writs of certiorari, prohibition, and mandamus raising the issue of newly found evidence but also challenging the petit jury venire.

In each application to the Supreme Court, the petitioners alleged:

"It was also discovered by the attorneys handling this matter that this Honorable Court, when it considered the prior application of petitioners (citation supra) only considered petitioner's attack on the Grand Jury of the Parish of Orleans and had failed to consider the fact that petitioners had also attacked the petit jury venire on the same grounds of systematic exclusion of Negroes from the petit jury by which they were tried."

a new trial *had it been pointed out that the Petit Jury had also been attacked as to the qualifications of its members,* etc. [¶] It is the law that both the Grand Jury and Petit Jury are drawn out of the same wheel, and that the wheel should at all times comprise not less than 750 names. Therefore, bringing both the Petit Jury and the Grand Jury within the same purview of the law."

The Supreme Court denied the writs but remanded the cause to the district court for consideration in view of the petitioners' having exhausted their state remedies. Poret v. Sigler, 1958, 355 U.S. 60, 78 S.Ct. 144, 2 L.Ed.2d 107.

After "in effect, retr[ying] the petitioners for the offense of which they have been convicted", the district court discharged the writ. Labat v. Sigler, E.D. La.1958, 162 F.Supp. 574. The district judge did not consider the issue of the exclusion of Negroes from the general venire or the petit jury venires in spite of the fact that the application clearly raised that issue as an alternate basis for relief. He simply referred to the Supreme Court's affirmance "after granting a writ of certiorari limited to an attack on the grand jury venire". Id. at 575.

The Fifth Circuit affirmed the district court, again without discussing the systematic exclusion of Negroes from the jury system although that issue was raised in the briefs. Labat v. Sigler, 5 Cir. 1959, 267 F.2d 307. The petitioners thereupon applied to the United States Supreme Court for writs of certiorari. The petition for certiorari alleged:

"Additionally it was urged that this Honorable Court had failed to pass on the exclusion of negroes from petit juries in the Parish of Orleans, State of Louisiana, when this case was before this Court previously. Michel vs. Louisiana, 350 U.S. 91 [76 S.Ct. 158]. * * * Insofar as the Motion to Quash the Petit Jury venire was concerned, as previously stated herein, a motion to quash the indictment was filed by Labat and Poret in the trial court as against the general venire and the Petit Jury."

(Emphasis added.) Counsel also pointed to State v. Butler, 1955, 227 La. 937, 81 So.2d 1 and State v. Chianelli, 1954, 226 La. 552, 76 So.2d 727, as holding that a motion to quash the indictment based on a *petit jury* having been drawn from an unlawfully constituted venire may be filed at any time before trial. See footnotes 4 and 5.

13. See footnotes 4 and 5.

The Supreme Court granted the writs, vacated the judgment of the Fifth Circuit, and remanded the case to the district court. United States ex rel. Poret v. Sigler, 1960, 361 U.S. 375, 80 S.Ct. 404, 4 L.Ed.2d 380. The case was remanded for

> the "disposition of the question whether members of petitioner's race were deliberately and intentionally limited and excluded in the selection of petit jury panels, in violation of the Federal Constitution."

B. The restrictive language of this order strongly suggests that the Supreme Court was satisfied that as to the petit jury the question of the composition of the panels was a live issue, the question of waiver, a dead issue. The district court, however, relying on *Michel (Labat-Poret)*, held that the petitioners, having failed to make timely objections to the jury, "are now deemed to have waived those objections". 234 F.Supp. at 175.

The district court's error on this point and the states' frequent reliance on the doctrine of waiver in federal habeas cases demonstrate the need in this circuit for a close look at the Supreme Court's discussion of that doctrine in Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837.

██ The "waiver" asserted in this case is simply a diaphanous euphemism for forfeiture of rights resulting from a procedural default. No one doubts that the state has a legitimate interest in establishing orderly procedures for filing certain pleadings *in limine*. No one questions the propriety of such a rule as to motions based on state-created rights asserted in state courts. And we are all familiar with useful legal fictions. But!

The initial trouble with the doctrine is the mismatch between the relatively minor default (here, probably, as is often the case, a result of the attorney's mistake of law) and the heavy penalty of forfeiture of constitutional rights. The penalty does not fit the offense. This incongruity affects the reasonableness of the local rule. Even if strict application of the rule were reasonable, as an appropriate means of preserving the integrity of a state's procedural system, there remains the serious question of the effect of such a rule on American federalism. Can a state—by the fictitious waiver doctrine, the exhaustion of state remedies principle, and the adequate-state-ground rule—convert a procedural default (at worst a waiver of state process) into a relinquishment of substantive federal rights? Fay v. Noia says "No" and severely limits the application of the doctrine when the rights at issue are federally-created or federally-guaranteed rights asserted in collateral (habeas) proceedings in the federal courts. It is true that federal habeas relief strains federal-state relations by lessening the finality of state criminal judgments. However, "conventional notions of finality in [state] criminal litigations cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for federal judicial review." 372 U.S. at 424, 83 S.Ct. at 841. The "jurisdiction of the federal courts on habeas corpus is not affected by procedural defaults incurred by the applicant during the state court proceedings * * *." 372 U.S. at 438, 83 S.Ct. at 848.

Fay v. Noia marks a turning point in the history of habeas corpus, but it is not revolutionary. In Davis v. Wechsler, 1923, 263 U.S. 22, 44 S.Ct. 13, 68 L.Ed. 153, the state court had held that a federal officer attempting to assert a federal venue privilege was deemed to have waived the defense by failing to make his appearance a "special" appearance under state law. In disallowing the state ground Mr. Justice Holmes, in language often quoted, said:

> "Whatever springes the State may set for those who are endeavoring to assert rights that the State confers, the assertion of Federal rights when plainly and reasonably made, is not to be defeated under the name of local practice." 263 U.S. at 24, 44 S.Ct. at 14.

To quote Justice Holmes again: "[H]abeas corpus cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved, opens the inquiry whether they have been more than an empty shell." [14]

The doctrine of waiver, as applied to forfeiture resulting from a procedural default, rests on three principles. (1) Failure to object or to make a timely objection based on federal rights constitutes constructive waiver of the objection and therefore of the federal rights. (2)

Failure to object or to make a timely objection violates the principle that a habeas applicant is not entitled to federal relief until he has exhausted the state's remedies. (3) Forfeiture of rights for a procedural default in accordance with a neutral state law is an adequate, independent, nonfederal ground for the defendant's conviction. "If exhaustion is interpreted to include presently unavailable remedies, it would appear that the waiver and adequate-state-ground rules are merely semantic variants of the exhaustion requirement." [15]

14. This language occurs in Justice Holmes's dissenting opinion in Frank v. Mangum, 1915, 237 U.S. 309, 346, 35 S.Ct. 582, 595, 59 L.Ed. 969, 988. In Fay v. Noia the Court noted that the principle it expresses was adopted by the majority in Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, which Justice Holmes also wrote. This Court, before and after Fay v. Noia, has consistently taken a jaundiced view of waiver in habeas proceedings in which the state has relied on the petitioner's failing to make a timely objection to the exclusion of Negroes from juries. United States ex rel Goldsby v. Harpole, 5 Cir. 1958, 263 F.2d 71, cert. denied, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78; United States ex rel Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, cert. denied, 372 U.S. 915, 83 S.Ct. 717, 9 L.Ed.2d 722; Whitus v. Balkcom, 5 Cir. 1964, 333 F.2d 496, cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343; Cobb v. Balkcom, 5 Cir. 1964, 339 F.2d 95. See also Whippler v. Balkcom, 5 Cir. 1965, 342 F.2d 388. In *Goldsby* the defendant's retained counsel, without consulting the defendant, failed to claim systematic exclusion of Negroes from the jury during the trial or on appeal to the state supreme court. We held that the defendant had not waived his right with respect to the trial jury. In *Seals* counsel made no objection before or during trial to the composition of either the grand jury or the trial jury. There was a plus fact in that the evidence of systematic exclusion was not known and not easily ascertainable. We held that Seals had not waived his constitutional rights to either jury. In *Whitus* the defendant's counsel decided not to raise the issue as to the trial jury because of the fear that if he did so community hostility would jeopardize his case with the jury. We held that there was

no waiver where the only choice was Hobson's choice. In *Cobb* the attorney did not discuss with a young and inexperienced defendant the question of the systematic exclusion of Negroes from the grand and trial juries. Georgia courts have a firm rule that the failure to make a timely constitutional objection constitutes a waiver of the objection. "In sum", Judge Bell said, "there was no intentional relinquishment of a known right within the purview of the majority opinion in Fay v. Noia * * *." 339 F.2d at 102.

15. Sofaer, Note, Federal Habeas Corpus for State Prisoners: The Isolation Principle, 39 N.Y.U.L.Rev. 78, 82 (1964). Cf. "Where the state [procedural] rule is a reasonable one and clearly announced to defendant and counsel, application of the waiver doctrine will yield the same result as that of the adequate non-federal ground doctrine in the vast majority of cases." Henry v. State of Mississippi, 1965, 379 U.S. 443, 448, n. 2, 85 S.Ct. 564, 567, 13 L.Ed.2d 408, 413.

A number of excellent articles discuss federal habeas as a post-conviction remedy for state prisoners: Note, The Freedom Writ—The Expanding Use of Federal Habeas Corpus, 61 Harv.L.Rev. 657 (1948); Hart, Foreword, The Supreme Court, 1958 Term, 73 Harv.L.Rev. 84, 101–121 (1959); Bator, Finality in Criminal Law and Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441 (1963); Brennan, Federal Habeas Corpus and State Prisoners: An Exercise in Federalism, 7 Utah L.Rev. 423 (1961); Reitz, Federal Habeas Corpus: Impact of an Abortive State Proceeding, 74 Harv.L.Rev. 1315 (1961); Reitz, Federal Habeas Corpus: Post-Conviction Remedy for State Prisoners, 108 U.Pa.L.Rev. 461 (1960); Meador, The Impact of Federal Habeas

■ First, in Fay v. Noia the Court narrowed fictitious waiver to the vanishing point. An "intentional relinquishment or abandonment of a known right or privilege", the "classic waiver" enunciated in Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, "furnishes the controlling standard". 372 U.S. at 439, 83 S.Ct. 822. The "limited discretion in the federal judge to deny relief * * * to an applicant who deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies * * * is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus." 372 U.S. at 438–439, 83 S.Ct. at 849. There must be a showing that the petitioner "after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts * * *. [T]he standard here put forth depends on the considered choice of the petitioner. * * * A choice made by counsel not participated in by the petitioner does not automatically bar relief. Nor does a state court's finding of waiver bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question." 372 U.S. at 439, 83 S.Ct. at 849. On the facts, Fay v. Noia is a strong case, for the decision not to appeal was made by Noia personally, after consultation with his counsel. The Supreme Court held that Noia had not deliberately by-passed state procedural law, because he was faced with the "grisly choice" of not appealing or of appealing, succeeding on appeal, and running the risk of a heavier sentence. "Each case must stand on its facts." 372 U.S. at 440, 83 S.Ct. at 849.

■ Second, Fay v. Noia recognized that while "comity demands that the state courts * * * should be appealed to in the first instance", if a petitioner's constitutional rights are denied "his remedy in the Federal court will remain unimpaired". 372 U.S. at 418, 419, 83 S.Ct. at 838. The rule of exhaustion is "not one defining power but one which relates to the appropriate exercise of power * * * else a rule of timing would become a rule circumscribing the power of federal courts on habeas, in defiance of unmistakeable congressional intent". 372 U.S. at 420, 83 S.Ct. at 839. Accordingly, the Court held that "§ 2254 is limited in its application to failure to exhaust state remedies still open to the habeas applicant at the time he files his application in federal court." 372 U.S. at 435, 83 S.Ct. at 847.

■ Third, the Court recognized that it had often declined to "review state court judgments which rest on independent and adequate state grounds, notwithstanding the presence of federal grounds", but held that "the adequate state-ground rule is a function of the limitations of *appellate* review" (Court's emphasis.) 372 U.S. at 429, 83 S.Ct. at 844. The "appellate function is concerned only with the judgments or decrees of state courts, the habeas corpus jurisdiction of the lower federal courts is not so confined. The jurisdictional prerequisite is not the judgment of a state court but detention simpliciter". 372 U.S. at 430, 83 S.Ct. at 844. "In Noia's case the only relevant substantive law is federal—the Fourteenth Amendment. State law appears only in the procedural framework for adjudicating the substantive federal question. The paramount interest is federal." 372 U.S at 431, 83 S.Ct. at 845. "The breath of the federal courts' power of independent adjudication on habeas corpus stems from the very nature of the writ. * * * The nature of the writ at common law, the language and purpose of

Corpus on State Trial Procedures, 52 Va. L.Rev. 286 (1966). Hill, The Inadequate State Ground, 65 Colum.L.Rev. 943 (1965). Cole and Small, Note: State Post-Conviction Remedies and Federal Habeas Corpus, 40 N.Y.U.L.Rev. 154 (1965). Comment, State Court Withdrawal from Habeas Corpus, 114 U.Pa.L.Rev. 1081 (1966). See also Sandalow. Henry v. Mississippi and the Adequate State Ground, 1965 S.Ct.Rev. 187.

the Act of February 5, 1867,[16] and the course of decisions" for a hundred years are "irreconcilable" with the view that the federal courts' habeas jurisdiction may be "defeated by [some]thing that may occur in the State court proceedings. State procedural rules plainly must yield to this overriding federal policy". 372 U.S. at 426, 83 S.Ct. at 842.

■ There are exceptional circumstances in this case. (1) The filing of the motions three and a half months before the trial gave the state sufficient notice to remove any question of the state's having been prejudiced by the default. (2) Literal compliance was impossible for Poret; he had no attorney who could have filed a timely motion. As for Labat, the default may have been caused by the inadvertence or mistake of an ill and aged court-appointed attorney.[17] (3) At the time the motions were filed, no one could say with certainty what the Louisiana law was as to the proper time for filing motions challenging the petit jury and the general venire; most commentators considered that the motion could be filed at any time before trial.[18] We disregard these and other exceptional circumstances. Under Fay v. Noia such plus factors have no relevance, in the absence of a contention that petitioners abused state processes by deliberately by-passing a known procedural requirement.[19] Fay v. Noia preserves the petitioners' objections to the Orleans Parish jury system—the general venire, the grand jury, the petit jury. We hold that, absent an intentional relinquishment of a known right and absent deliberate by-passing of a known procedural requirement, a procedural default in a state court, such as failing to make a timely challenge to the jury system, does not bar the petitioner's right to assert the challenge in a federal habeas proceeding.

■ The untimeliness of the petitioners' challenge to the jury system in Orleans Parish and the Louisiana courts' holding that this untimeliness constituted a "waiver" of the challenge have bearing here only to show that the petitioners exhausted their state remedies and did not intentionally by-pass state process. The Supreme Court's affirmance in *Michel (Labat-Poret)* of the Louisiana courts' holding that the petitioners "waived" their objections to the grand jury is limited by the fact that the Supreme Court made this holding in the exercise of its appellate functions on a direct review of the Louisiana judgments.

Fay v. Noia rescued the grand jury issue squarely raised but not previously decided in this habeas proceeding. The petitioners are entitled to a decision on this issue as well as on the petit jury issue.

■ Federal habeas relief for unlawfully detained state prisoners is part and parcel of the Supremacy Clause.[20] State

16. Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385. This act expanded habeas jurisdiction of federal courts to include "all cases where any person may be restrained his or her liberty in violation of the constitution, of any treaty or law of the United States;" that is, state prisoners asserting federal rights.

17. "Of course, any civilized system of judicial administration should have enough looseness in the joints to avert gross denials of a litigant's rights growing out of his lawyer's mistake or even negligence in failing to file the proper kind of pleading at precisely the prescribed moment." Berman v. United States, 1964, 378 U.S. 530, 538, 84 S.Ct. 1895, 1899, 12 L.Ed. 2d 1012, 1017.

18. See footnotes 4 and 5.

19. The defendant's "deliberate by-passing of State procedures" is "the only ground for which relief may be denied in federal habeas for failure, to raise a federal constitutional claim in the state courts". Jackson v. Denno, 1964, 378 U.S. 368, 370, n. 1, 84 S.Ct. 1774, 1777, 12 L.Ed.2d 908.

20. "Insofar as this [habeas] jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the

courts cannot expect to have the last say on a local procedural rule that defeats or dilutes an accused's federal constitutional right to trial by an impartial jury.

## II.

 A. Seven hundred and fifty years ago Magna Carta declared, "No free man shall be * * * imprisoned * * .* or in any way destroyed, except by the lawful judgment of his peers or [and] by the law of the land." [21] By Blackstone's time, *judicium parium*, the privilege King John granted his vassals at Runnymede, was linked, erroneously but indissolubly, with the "right of trial by jury, of the country, *per patriam*, * * * that trial by the peers of every Englishman." [22] "The very idea of a jury", the Supreme Court has said, "is a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status as that which he holds". Strauder v. West Virginia, 1879, 100 U.S. 303, 25 L.Ed. 664. The importance of the right to a jury of one's peers extends beyond any individual defendant: "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." Smith v. State of Texas, 1940, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84.

B. In the interest of achieving uniformity in decisions on the exclusion of Negroes from juries, this Court sat en banc on *Labat-Poret* and six other cases [23] involving similar contentions. Two of those cases also involved jury systems in Louisiana. In Scott v. Walker, 5 Cir. 1966, 358 F.2d 561, a Negro, under sentence of death for rape, charged that Negroes were excluded from petit juries in Livingston Parish. In Davis v. Davis, 5 Cir. 1966, 361 F.2d 770, a Negro, under sentence of death for the murder of a white police officer, charged that Negroes were excluded from the jury system in Acadia Parish. In each case this Court found that the petitioner had made a prima facie case, chiefly on the great disparity between the percentage of Negroes in the parish and the percentage of Negroes shown to have been included on the general venires. In each case the state failed to furnish a constitutionally acceptable explanation for the disparity. Accordingly, this Court set aside the convictions and remanded the cases with directions that the district court issue the writs releasing the prisoners, subject, of course, to retrial of the petitioners by the state.

 Scott v. Walker lays down valuable guidelines in this difficult area of the law:

"The first is that the systematic exclusion of Negroes from juries in judicial districts where Negroes represent a substantial part of the population constitutes a deprivation of equal protection under the Fourteenth Amendment. Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, where the Supreme Court said, 'When a jury selection plan, whatever it is, operates in such a way as al-

---

Constitution whereby federal law is higher than state law." Mr. Justice Frankfurter in Daniels v. Allen, decided sub. nom. Brown v. Allen, 1953, 344 U.S. 443, 510, 73 S.Ct. 397, 448, 97 L.Ed. 469.

21. Chap. 39. The "peers of a Crown tenant were his fellow Crown tenants". McKechnie, Magna Carta, 379 (2d Ed.). "The idea that a vassal should be judged by his peers is an integral part of the feudal ideal of society." Keeney, Judgment by Peers, 110 (1952).

22. Blackstone, Commentaries, Bk. IV, Chap. xxvii, 349 (Tucker 1803).

23. Scott v. Walker, 5 Cir. 1966, 358 F.2d 561; Billingsley v. Clayton, 5 Cir. 1966, 359 F.2d 13; Davis v. Davis, 5 Cir. 1966, 361 F.2d 770; Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34; Jackson v. United States, 5 Cir. 1966, 366 F.2d 34; Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1.

ways to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand.' 332 U.S. 463, 469, 68 S.Ct. 184, 187. The second proposition which is equally clear is that the inclusion of a minimal or token number of Negroes on a jury list does not prevent the systematic exclusion rule from operating, for the Supreme Court has said in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469: 'Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. [State of] Texas, 311 U.S. 129, [61 S.Ct. 164, 85 L.Ed. 84].' See also United States ex rel. Willie Seals, Jr. v. Wiman, 5 Cir., 304 F.2d 53, 67. A further proposition, not in dispute, is that the Constitution does not require an exact proportion between the percentage of Negroes in the population and the percentage of Negroes on the jury lists, nor does the Constitution require that any particular panel of jurors in a criminal trial include members of the race of the accused person. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. Finally, it is also clear that there is a burden of proof upon the petitioner in a habeas corpus proceeding to establish sufficient facts to warrant a finding of denial of his constitutional rights. Swain v. State of Alabama, supra."

The Supreme Court has held that the "indisputable fact that no Negro had *served* on a criminal court *grand* or *petit jury* for a period of thirty years created a very strong showing that during that period Negroes were systematically excluded from jury service because of race. * * * [imposing] a duty [on] the State to try to justify such an exclusion as having been brought about for some reason other than racial discrimination". Patton v. State of Mississippi, 1947, 332 U.S. 463, 466, 68 S.Ct. 184, 186, 92 L.Ed. 76. (Emphasis added.) Testimony of a

jury commissioner that he had "never known of a single instance where any Negro sat on a grand or petit jury in the entire history" of the country "in itself made out a prima facie case of the denial of equal protection". Norris v. State of Alabama, 1934, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074. See also Hernandez v. State of Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866.

In a transitionary period where jury commissioners are moving, but moving slowly, toward a nondiscriminatory system of selecting a cross-section of the community, sophisticated methods of token inclusion of Negroes on venires have increased the defendants' burden of proving a prima facie case of systematic exclusion. When Negro representation on venire lists is not extremely disproportionate to the Negro population in the parish, the burden may be a heavy one. See Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 825, 829–830, 13 L.Ed. 2d 759; Note 75 Yale L.J. 322, 326. But, as this Court has said, "very decided variations in proportions of Negroes and white on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service." United States ex rel. Seals v. Wiman, 1962, 5 Cir. 304 F.2d 53, 67. *Swain* is not inconsistent with the views expressed in *Seals*. In *Swain* the Court specifically approved the inference of discrimination drawn in *Patton* and *Norris* as "determinative absent sufficient rebuttal evidence". The Court simply rejected "woodenly" application of "this rule of proof * * * to cases where the discrimination is said to occur during the process of peremptory challenge of persons called for jury service". 380 U.S. at 227, 85 S.Ct. at 839. In *Swain* the Court noted that "Negroes served on 80% of the grand juries selected, the number ranging from one to three". 380 U.S. at 205, 85 S.Ct. at 828.

C. The approach developed in Scott v. Walker, Davis v. Davis, and other jury exclusion cases requires close scrutiny of

the statutory procedures for jury selection and the actual practices of the jury commissioners.

Under the law as it existed at the time Labat and Poret were indicted and tried, the Orleans Parish Jury Commission consisted of three commissioners appointed by the Governor for a four year term.[24] In Orleans Parish there has never been a Negro jury commissioner. And the Commission has never employed a Negro. Compare Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1.

The Commission must maintain a "jury wheel" (general venire) at all times filled with the names of at least 750 prospective jurors. From the wheel the grand jury venire is selected and the petit jury venires are drawn at random.[25]

In the selection of names for the jury wheel, the commissioners' clerical staff culls from the city directory[26] names of persons who have never served as jurors. The staff does not select doctors, lawyers, school-bus drivers, and others whose occupations indicate that they would be excused from jury service by statutory exemption.[27] The staff also avoids selecting manual laborers, daily wage earners, and "outside" workers (for convenience we include all of these in the term "daily wage earners"), although there is no statutory authority for this practice. Thus, Mr. V. G. Warner, a jury commissioner in 1953, testified:

"A So we went and used the City Directory also starting then and marked off indiscriminately names. As far as occupations, we found out that all of the people that were, say, carpenters, painters, welders, mechanics, shipfitters, they all—the commission found they all wanted to be excused.

Q People that were laborers would want to be excused?

A Because they were going to lose money. * * * [W]e would try to mark off [select for jury duty] people that looked like they were either inside workers, sala-

24. Under the law, the jury system in Orleans Parish differs in certain respects from the system used in other parishes. For example, instead of a general venire of 750 names in a "jury wheel", and a proposed petit jury venire of 150, other parishes have a general venire of 300 names in a jury box and a proposed petit jury venire of 30 to 100. Cf. LSA–R.S. 15:175–15:189 with 15:191–15:203. See Scott v. Walker, 358 F.2d at 563.

25. "LSA–R.S. 15:194: *Selection of jurors; preparation, preservation and supplementing of jury list* The said commissioners shall select at large, impartially, from the citizens of the Parish of Orleans having the qualifications requisite to register as voters, the names of not less than seven hundred and fifty persons competent under this Code to serve as jurors. A list of these names shall be prepared, certified to by the commissioners, and kept as a part of the records of their office subject to the orders of the judges of the criminal district court of said parish. The names on said list shall be copied on slips prepared for the purpose, with the number and address corresponding to that on the lists and shall be placed in the jury wheel from which the drawing is to be made. No name shall be canceled from said lists or withdrawn from the jury wheel without an order of court, and the said list shall be a correct and perfect record of the names in the jury wheel. The said list shall be supplemented from time to time as the necessities of jury service may require. No drawing shall be made from a list of less than seven hundred and fifty (750) names, unless in an extraordinary case when tales jurors are ordered by one of the judges of the criminal district court, said judge may, in his discretion, in order to avoid delay, order said drawings from a list and jury wheel containing not less than five hundred (500) names, and in such cases it shall be the duty of said commissioners immediately after said drawing to refill the said wheel and complete said list so as to reach the required number of seven hundred and fifty (750) names."

26. The Commission also used other sources from time to time but never consistently or extensively: the telephone directory, the voters' registration rolls (for a short while), employees of large corporations, friends and acquaintances.

27. See footnote 37 for LSA–R.S. 15:174.

ried workers, or in some kind of sales work or in executive types, something like that, where they would not be subject to lose money.

 &ast; &ast; &ast; &ast; &ast; &ast;

A Anybody that looked like he was an inside man, in other words, that he wouldn't be subject to be docked or lose money, that his firm would let him off to serve on the jury."

Mr. J. B. Murphy, Chief Supervisory Clerk of the Commission since 1943 testified:

" &ast; &ast; &ast; [The Commission would not send notices to] any truck drivers, welders, painters, shipfitters, boilermakers, except if they were working for the Government, or the State or the School Board, we didn't mark them off because we knew from past experience that it would be fruitless. &ast; &ast; &ast; [A] lot of people that we have marked in here looked like they were inside people, [but when] they were decided by their employees that they were hourly rated &ast; &ast; &ast; they were not allowed to serve."

Jury notices are mailed to those selected as potential jurors requiring their appearance before the commissioners. When they appear, they are required to answer certain written questions on the reverse of the subpoena. In 1953 one of the questions related to the race of the prospective juror.[28] The commissioners excuse daily wage earners and those who do not meet age, residence, literacy, or other statutory qualifications.[29] The names of the qualified potential jurors are kept in an alphabetized card index which may contain as many as 40,000 names. The index forms the pool from which the commissioners select the 750 names to fill the jury wheel.

Twice a year the Commission selects from the jury wheel 75 names for the grand jury venire. These are submitted to one of the judges in the Criminal District Court, who in rotation, empanel the grand jury. The judge, usually after interviewing a substantial number of prospective grand jurors, selects twelve to serve for a six months term. LSA–R.S. 15:195.

After the grand jury venire has been selected, the Commission draws from the jury wheel at random a *"proposed [petit jury] venire"* of 150 names. Additional drawings of 150 names are made until each section of the Criminal District Court has a proposed venire of 150 prospective petit jurors. These persons are subpoenaed to appear before the judges of the Criminal District Court. Each judge then selects the *"final venire"* or panel of about 75 from which the petit juries are selected. The veniremen serve

---

28. Mr. V. B. Warner, chairman in 1952–1953, testified that the question was to enable the staff to assemble statistics as to participation by Negroes in the jury selection process so as to aid the chairman when he testified (as he frequently did) on this question in criminal cases. This statistical material has disappeared. Apparently no attempt to assemble it as a permanent or meaningful record was ever made. The chairman testified that it existed as notes on pieces of paper kept in an employee's desk drawer.

29. "LSA–R.S. 15:172 *Qualifications*
 The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows:
 To be a citizen of this state, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the district judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.
 In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community."

a term of one month. In selecting prospective jurors for this final venire (petit jury panel), the judge usually calls for volunteers. LSA–R.S. 15:196. The record does not indicate the number of Negroes who volunteer for jury duty. The judge exercises considerable discretion in determining the composition of the final venire although his statutory authority appears to be limited to determining the competency of individual jurors.[30] If daily wage earners appear and ask to be excused from the final venire because of financial hardship, the judge generally grants the request.

Judge Fred Oser of Section "C", who selected the petit jury venire furnishing the jury that tried Labat and Poret, is dead. Judge William J. O'Hara, who was on the Criminal District Court for the Parish of Orleans from 1932 to 1962, testified:

> "Well, I think the principal reason [to be excused] was what you might call hardship reasons. In other words, they had to remain on the job to get their pay or they had to keep their business going or, in other words, they could not take time off from their job or their business or something else. They had families and obligations. They would present a case that it would be a hardship on these men to require them to serve.
>
> (19) Q Was it not generally the excuse that they were wage earners and that if they had to serve on the jury

where they didn't get paid, as in Louisiana they don't get paid, that they would miss that day's work?

A Well, we had quite a number of those excuses, yes, of that type.

Q Would you say that that was one of the largest reasons for excuse?

A Well, I guess you could say that. I am just talking generally from my recollection, but that was a very frequent situation that we had to deal with. Particularly after the Wage and Hour Laws were passed by the United States Government, these people had to work so many hours and if they did not work the hours they would not get paid for it. That was probably the major number of excuses that were presented."

The Louisiana statutes relating to the jury system are not discriminatory on their face. Discrimination against Negroes comes from the administration of the system. The jury commissioners who served Orleans Parish in 1953 testified that they made no effort to broaden the base of the card index (the pool) by changing the methods of prior commissioners or by seeking out Negroes to compensate for the large number disqualified as daily wage earners.[31] The Commission inherited a card index that for years had succeeded in producing only white jurors on the grand jury and the petit jury in Orleans Parish. Its failure to change the system amounted to a deliberate decision to continue the sys-

---

30. LSA–R.S. 15:192 provides: "The jury commissioners for the Parish of Orleans shall qualify all persons before their selection as jurors, but the judges of the several district courts shall have the right to decide upon the competency of jurors."

31. Mr. V. G. Warner, Chairman of the Jury Commission 1952–56, testified that he did not "know of any particular effort made to get any number of Negroes in". Mr. D. Knowles, who has been on the Commission since 1952, stated that "about the only [sources of prospective jurors] were the city directory, the telephone book * * * [and] the registration office", which was "very unsatisfactory"; that the Commission never sent notices to Negro churches, or a Masonic organiza-

tion or club: "we have never checked out any organization of any kind or character to send notices to." He was asked: "Has there been any attempt on the part of the Jury Commission to change its policy as to the selection of Negroes to serve on jury venires in Orleans Parish over the years * * * to increase the number of Negroes serving on the jury venire? He replied: "In the first place, we wouldn't know how to do that." Mr. Knowles admitted that the Jury Commission had never "met and decided they wanted to as a matter of policy increase the number of Negroes serving on the venire". The "method has not been changed over the years * * * it still follows the same pattern".

tematic limitation of Negroes on the venires. This Commission policy, along with the judges' policy of excusing all daily wage earners from the jury venires, had the end effect of totally excluding Negroes from the most important stage of the system—final fact-finding by a trial jury.

D. Turning to the facts showing the operative effects of the Orleans Parish jury system, we find that many of the facts have been stipulated. There are also a large number of statistical reports (See Appendix) which the district court allowed in evidence and considered in reaching its findings.

The outstanding fact is that in 1953 all white juries were invariably the rule in Orleans Parish. As Justice Black pointed out in his opinion in the first *Labat-Poret* case:

"Only once within the memory of people living in the parish had a colored person been selected as a *grand* juror. That juror, who happened to look like a white man, was selected under the mistaken idea that he was one." 350 U.S. at 102, 76 S.Ct. at 165

At the time Labat and Poret were tried, no Negro had ever served on a *petit jury* in a criminal case in Orleans Parish.

The petitioners' counsel introduced in evidence the jury venire lists of Orleans Parish for 103 months, January 1948, to March 1953, in every section of the Orleans Parish Criminal District Court. The venire lists show a total of 20,492, of which 715 were definitely Negro,

10,816 were definitely white, and 8,958 were undetermined.

Comparison of the Negro percentage of Orleans Parish population with the Negro percentage of veniremen in the Orleans Parish Criminal District Court in itself makes a strong showing of systematic exclusion of Negroes from jury service. The 1950 census found that of a total of 570,445 residents, 182,631, or about 32 per cent were Negro.

In a sample of 8657 jurors selected during the period from January 1948 to March 1953 for the jury commissioners' proposed venires,[32] the aggregated average proportion of non-whites was 6.2 per cent; the non-white population eligible for jury duty was 25.8 per cent.[33] One could expect the proportion of Negroes on the proposed venire to vary above and below the figure of 25.8 per cent; in no instance, however, did the proportion of non-whites exceed 16.1 per cent. If attention is confined to the months immediately preceding the trial, November 1952 to March 1953, of the 1964 jurors whose race was determined only 4.9 per cent were Negro. In no one single venire was the proportion of Negroes above 9.6 per cent.

One of the stipulations states that the Jury Commissioners certified Negroes for the general venire "in numbers approximating 10% of the venire".[34] Since the final winnowing of jurors takes place when the proposed venire is reduced to the final venire, we consider that comparative figures showing white and Negro jurors should be based on the

---

32. The figure 8657 excludes those veniremen whose race could not be determined from the commissioners' records. A subsample of those whose race had been undetermined was checked against voter registration records. Of the 247 jurors in the subsample whose race it was possible to determine in this fashion 6.0 per cent were Negro. A subsample of those final veniremen whose race was initially undetermined included 177 of the jurors who were in the previous subsample. Only 1.7 per cent of those in this subsample were Negro.

33. This figure takes into account the qualifications stated in LSA–R.S. 15:172 and the exemptions provided for in LSA–R.S. 15:174. It excludes women, because women do not ordinarily serve on the juries in Louisiana; they must volunteer.

34. Stipulation 13 provides: "That although prior to February, 1953, no Negro had ever served on a petit jury empaneled to try a Negro in the Criminal District Court for the Parish of Orleans, since 1936, the Jury Commissioners had certified Negroes as qualifying under the state law in petit jury venires in numbers approximating 10% of the venire."

final venires. Of the 8657 proposed veniremen studied, 4094 were selected for the final venire. Of these final veniremen, 3.7 per cent were Negro. In the period from November 1952 to March 1953, the proportion of Negroes on the final venire was only 3.1 per cent. It is understandable therefore that none of the Negroes included on the final venire served on petit jury panels

Labat and Poret were tried February 25, 1953, in Section "C" of the Criminal District Court for the Parish of Orleans. Jurors for their trial were drawn from panels furnished to Sections "C" and "E". On the proposed venire for Section "C" for February 1953, there were 150 prospective jurors, of whom 91 were white persons, one was a Negro, and 58 were of undetermined race. Of those proposed veniremen, 53 served in the final venire. Of these 53, 45 were definitely white persons, none was a Negro, and 8 were of undetermined race. There were 149 on the proposed venire furnished to Section "E". Of these, 83 were definitely white persons, 3 were Negroes, and 63 were of undetermined race. Of the proposed veniremen, 57 were selected for the final venire. Of these, 51 were white persons, none was a Negro, and 6 were of undetermined race.

The percentage of Negroes in Orleans Parish of 32 per cent compares with the percentage of Negroes on the petit jury venires of 3.7 per cent over a five year period and 3.1 per cent for several months before the trial. In Scott v. Walker, we held that proof of 13 per cent Negro population and only one per cent Negro veniremen makes a prima facie case of token representation of Negroes on venire lists. In United States ex rel. Seals v. Wiman, supra, we found "tokenism" where two per cent of veniremen were Negroes in a county where 31.7 per cent of the male population over 21 years of age was Negro. In

both of these cases, the underrepresentation of Negroes on venires is only somewhat more pronounced than in the instant case. The disparity in this case is about the same as that in Speller v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (reported with, and sub nom. Brown v. Allen). In Speller v. Allen, the court noted that the jury lists were made up from county tax lists, containing 8,233 individual taxpayers, of whom 3,136 or 38 per cent were Negroes. The jury box involved contained 2,126 names, but of that number only 145 or 7 per cent were names of Negroes. The Court said, "This disparity between the races would not be acceptable by this Court solely on the evidence of the clerk of the commissioners that he selected names of citizens of good moral character and qualified to serve as jurors, and who had not paid their taxes". 344 U.S. at 481, 73 S.Ct. at 419.[35]

State of Louisiana v. Dowels, No. 139,-324, Criminal District Court for the Parish of Orleans; Oct. 1952 (unreported) is the only known case in which the Criminal District Court for the Parish of Orleans quashed an indictment because Negroes had been systematically excluded from parish juries. In Dowels Judge O'Hara, who testified in this case, *described the grand jury system in Orleans Parish at the very time Labat and Poret were indicted and tried:*

> "[N]o negroes have served on a grand jury since 1936 when there were negroes in the jury wheel; [and] the presence of negroes in the jury wheel has brought no change in the continuous omission of negroes from the grand jury in Orleans. * * * *His Honor Judge Fred Oser of Section 'C' [who presided at the trial of Labat and Poret] testified. * * * That he had never selected a colored person on the grand jury; that none of those selected to be interviewed were*

35. The State rebutted the presumption by showing that the clerk relied on a "comparative wealth" standard based on the tax rolls. This standard was "unchallenged". The Court held that, "Disregarding, as we think we should, the clerk's unchallenged selections based on taxable property, there is no evidence of racial discrimination". 344 U.S. at 482, 73 S.Ct. at 420.

*colored;* that he had never discriminated against any venireman because of race or color in making his decision. * * * It is obvious, therefore, that the reason that no colored person has ever served on a grand jury in the sixteen years in which colored persons have been placed in the jury wheel is because no colored person has been selected by any of the judges, including the judge of this court, for such service. * * * If colored persons constantly appearing on the grand jury venire are consistently eliminated from grand jury selection because of a certain standard of selection employed by officers making the selection, can it be said that colored persons have the opportunity to serve on the grand jury? * * * *Our situation in Orleans seems to be particularly vulnerable to the theory of the United States Supreme Court 'that chance and accident alone can hardly explain the continuous omission of negroes from grand juries over a long period of time'* because we have five courts, and in the last four years six courts, selecting grand juries and the record shows that notwithstanding the number of courts that select grand juries, and regardless of which court selects a grand jury, or when that court selects a grand jury, or how that court selects a grand jury, or how often one court or all courts have selected a grand jury, or over that period of time any court or all courts continue to select grand juries, the omission of negroes is consistent, constant and the same. [It is] the practice of four out of the six courts to select from the list of seventy-five, fifteen, twenty or twenty-five for interview, preliminarily to their appointment as grand jurors, no colored person was ever among the veniremen selected for interview by any of the four courts. * * * While this court is conscious of its fallibility, it is firm in its opinion that this record in the Supreme Court of Louisiana or of the United States, would support no other ruling except

a ruling quashing the indictment herein because of intentional and systematic exclusion of negroes from grand juries in Orleans Parish because of race and color and in violation of the Fourteenth Amendment, inclusive of the grand jury that returned the indictment in this case, because that grand jury is not differentiated from the pattern of jury selection that consistently eliminated colored persons from grand juries. * * * It is the individual opinion of this court that the selection of grand juries in this community throughout the years has been controlled by a tradition and the general thinking of the community as a whole is under the influence of that tradition." (Emphasis added. Quoted at length by Justice Black in *Eubanks*, 356 U.S. at 588, fn. 4, 78 S.Ct. 970).

Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 speaks with an especially loud and clear voice on the grand jury system in Orleans Parish. The Supreme Court noted that from 1936, when the Jury Commission first started to include Negroes in the pool of potential jurors, until 1954, when Eubanks was indicted, 36 grand juries were selected in Orleans Parish. Six or more Negroes were included on each list of 75 names from which the judge selected the grand jury. The Court observed, "Yet out of the 432 jurors selected only a single Negro was chosen", and he was chosen by mistake. 356 U.S. at 586, 78 S.Ct. at 972. "Undisputed testimony also proved that a substantial number of the large Negro population in the parish were educated, registered to vote and possessed the qualifications required for jury service, all of which is emphasized by the fact that since 1936 the Commission has regularly selected Negroes for the grand jury panel. Indeed, Negroes have served on the federal grand jury in the parish for many years." 356 U.S. at 587, 78 S.Ct. at 973. The Court noted that "judges now serving on the local court testified generally [as they did in this case] that

they had not discriminated against Negroes in choosing grand juries, and had only tried to pick the best available jurors". The Court brushed aside these "general assertions by officials of their performance of duty":

"We are reluctantly forced to conclude that the uniform and long-continued exclusion of Negroes from grand juries shown by this record cannot be attributed to chance, to accident, or to the fact that no sufficiently qualified Negroes have ever been included in the lists submitted to the various local judges. It seems clear to us that Negroes have been consistently barred from jury service because of their race." 356 U.S. at 587, 78 S.Ct. at 973.

In Patton v. State of Mississippi, 1947, 332 U.S. 463, 469, 68 S.Ct. 184, 92 L.Ed. 76, a unanimous opinion, the Supreme Court declared:

"When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand."

Quoting this statement in *Eubanks*, the Court said, "This is essentially the situation here." 356 U.S. at 587, 78 S.Ct. at 973 Eubanks was indicted in 1954. The Orleans Parish grand jury system described in *Eubanks* and *Dowels* is the

identical system challenged here. The jury commissioners responsible for the general venire at the time Eubanks was indicted were the very same persons responsible for the general venire when Labat and Poret were indicted. The district court that selected the grand jury which indicted *Eubanks* selected the grand jury which indicted Labat and Poret and selected the petit juries in *Eubanks* and *Labat-Poret*.

### III.

■■ The prima facie case the petitioners established placed a burden on the state of coming forward with rebuttal evidence and a constitutionally acceptable explanation for the facts that gave rise to the inference of deliberate and intentional discrimination. Here the state relies on general conclusionary denials and its contention that the "disproportions" which the district court found to "exist between the races on the jury panels in Orleans Parish" resulted, not from racial discrimination but primarily from the benign practice of excusing from jury service "outside" workers, manual laborers, and earners paid daily wages, most of whom are Negroes. These persons were excused, allegedly, not because many were Negroes but bcause they were paid a daily wage; to force such persons to serve on a jury would subject them to an undue hardship.[36]

■■ We find this explanation unacceptable. (A) The exclusion of daily

---

36. The district court found: "The testimony did show that it was quite customary for both the jury commissioners [in filling the jury wheel and selecting the proposed venire] and the judge [in selecting the final venire] to excuse from jury duty persons particularly who were engaged in common labor for a living. Jurors are not paid any fees in Orleans Parish, and consequently, in many cases, serving on a jury, either a grand jury or a petit jury, would constitute a real hardship to a person of limited means and income. Thus, there were probably more common laborers excused from jury duty for this reason than any other class of people. However, there is no indication of any kind in this record that in granting excuses to common laborers any distinction whatsoever was made between excuses granted to Negroes who were common laborers and whites who were common laborers. The testimony shows that in the great majority of cases, it was the prospective juror himself who requested the relief from jury duty rather than the relief being instigated or suggested by the judge or the jury commissioner. Whenever the judge or the jury commissioners felt that it would be a real hardship, and particularly a financial hardship, for a person to serve as a juryman, his request for excuse from jury duty was seriously considered and generally granted." 234 F.Supp. at 177.

wage earners *as a class* violates the petitioners' due process and equal protection rights to an impartial jury representing a cross-section of the community. (B) The exclusion of this large class, 47 per cent of all Negro workers in Orleans Parish, as the district judge found, discriminates against Negroes in violation of the equal protection clause in that the class contains a disproportionately large number of Negroes. (C) Contrary to the district court's holding, there is no Louisiana statutory authority permitting jury selection officials to exempt daily wage earners *as a class*.

A. Jury service is a burden on all who serve. And of course it falls most heavily upon daily wage earners. But this segment of the community is so large and so important that a jury system without daily wage earners simply is not representative of the community. "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." Smith v. State of Texas, 1940, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84. "[T]he proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community', and not the organ of any special group or class. If that requirement is observed,

the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community." Glasser v. United States, 1941, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680. Smith v. State of Texas dealt with the jury system in state courts, *Glasser* with the system in federal courts.

The overriding consideration in establishing a jury system is not the burden of jury service on prospective jurors but the fairness of the system. The two considerations may be accommodated by exemption of certain occupational groups, for example, doctors and firemen; the good of the community requires that their services not be interrupted by jury duty. But the policy determination of what constitutes a proper cross-section of the community is a matter for the legislature—at least in the first instance. Here, the Louisiana legislature settled the question when it omitted daily wage earners from its list of groups exempt from jury duty.[37]

The breadth of this Orleans Parish policy of excluding wage earners reflects its arbitrariness. Not just manual laborers are excluded; in addition, "out-

37. "LSA–R.S. 15:174. *Persons exempt from jury service*

The following persons shall be exempt from serving as grand or petit jurors, but the exemption shall be personal to them and when they do not themselves claim exemption, it shall not be sufficient cause for challenging any person exempt under the provisions of this article:

(1) The members, the officers, and the clerks of the legislature, during the session of the legislature and in going and returning from the same.

(2) The governor, lieutenant-governor, state auditor, state treasurer, secretary of state, superintendent of public education, their clerks and employees.

(3) Judges and active officers of the several courts of this state, attorneys-at-law, physicians, surgeons, and dentists actively engaged in the practice of their profession and duly licensed under the laws of this state, professors and school

teachers, school bus drivers, apothecaries, and all members of paid fire departments, and all commercial travelers, residing in the state who are actually engaged in traveling, for themselves or in the interest of wholesale dealers, commission merchants or manufacturers.

(4) All persons over sixty-five years of age, those who from sickness or other physical infirmity may be incapacitated from rendering such service, and those who have served as grand jurors under the provisions of this article during the previous six months, and those who have served as petit jurors as herein provided, who shall not again be called as jurors until after the expiration of one year from the date of their service.

(5) All telegraph and telephone operators and railroad station agents. Also chief engineers of electric and water works systems."

side" workers such as truck-drivers and service employees and such workers as carpenters, painters, welders, mechanics, shipfitters, boiler-makers, and plasterers are excluded. Even if it could be assumed that there is a relationship between manual laborers, a class containing a disproportionately large number of illiterates, and incompetency for jury service, such an assumption cannot be applied to outside workers and skilled workers. The fact is, however:

> "Jury competence is not limited to those who earn their livelihood on other than a daily basis. One who is paid $3 a day may be as fully competent as one who is paid $30 a week or $300 a month. In other words the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror." [38]

There is no dispute as to the policy of the jury selection officials in Orleans Parish, commissioners and judges: it was one of *systematic total* exclusion of daily wage earners as a *class*. In this respect the case differs materially from Fay v. People of State of New York, 1947, 332 U.S. 261, 67 S.Ct. 1613, 91 L. Ed. 2043 and United States v. Flynn, 2 Cir. 1954, 216 F.2d 354, relied upon by the district court.[39] The court in those cases accepted the principle that a jury should represent a cross-section of the community but found that the defendants' statistics did not prove a policy or "formal method" of total or systematic exclusion of laborers (*Fay*) and of Negroes, Puerto Ricans, and laborers (*Flynn*). Cf. United States v. Bove, 2 Cir. 1966, 360 F.2d 1, 7.

Thiel v. Southern Pacific Co., 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1183, involved a total exclusion similar to the systematic exclusion of daily wage earners in Orleans Parish. A federal jury commissioner and clerk of court testified, as the commissioners testified here, that they "intentionally excluded from the jury lists all persons who work for a daily wage". 328 U.S. at 221, 66 S.Ct. at 986. The clerk stated that he and the commissioner, as in this case, "generally used the city directory as the source of names of prospective jurors. * * * [when] a juror is called into court on a venire and says that he is working for $10 a day and cannot afford

---

38. Thiel v. Southern Pacific Co., 328 U.S. 217, at 223, 66 S.Ct. 984, at 987, 90 L.Ed. 1181.

39. In *Fay* the defendants challenged a "blue ribbon" jury as used under a special jury law of New York. The Court said that the "uncontradicted evidence is that no person was excluded because of his occupation or economic status". 332 U.S. at 291, 67 S.Ct. at 1629. The Court also noted that Fay reported a net taxable income of over $65,000 for the years 1940 to 1942 and Bove over $30,000. This showing did "not identify them very closely with the viewpoint of the depressed classes". The group with which they were most closely identified was organized labor, but it could not be claimed that union members were excluded from the panel. 332 U.S. at 293, 67 S.Ct. at 1630. In *Flynn* the Court found that the "appellants' own proof demonstrates quite readily that random notice distribution, coupled with legitimate qualifications standards, [had] operated to produce the very disproportions of which they complain". 216 F.2d at 384. Unlike the Louisiana statute, 28 U.S.C. § 1863 provides that "Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of a district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience * * *." See United States v. Brandt, N.D.Ohio 1955, 139 F.Supp. 349 in which the Court discussed *Fay*, *Flynn*, and *Thiel* and distinguished *Thiel* on the ground that the "issue decided in *Thiel* was that the total exclusion of wage earners by jury officials was unlawful." 139 F.Supp. at 354. In State v. Krieger, 1947, 212 La. 527, 33 So.2d 58 the chief clerk of the New Orleans Department of Public Property was charged with forgery of checks made payable to persons placed on the garbage pay-roll account. He challenged the jury venire on the ground that white manual laborers were systematically excluded from the proposed petit jury venire of 150 for October 1946. The Supreme Court affirmed the district court's finding that the evidence did not show systematic exclusion of white manual laborers.

to work for four [dollars], the Judge has never made one of those men serve, and so in order to avoid putting names of people in who I know won't become jurors in the court, won't qualify as jurors in this court, I do leave them out". The "jury commissioner corroborated this testimony, adding that he purposely excluded 'all the iron craft, bricklayers, carpenters, and machinists' because these men came into court and offered that [financial hardship] as an excuse, and the judge usually let them go". The Supreme Court ordered a new trial "by a jury drawn from a panel properly and fairly chosen." The Court said in *Thiel:*

> "Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury. * * * This exclusion of all those who earn a daily wage cannot be justified by federal *or state law.* Certainly nothing in the federal statutes warrants such an exclusion. *And the California statutes are equally devoid of justification for the practice.* * * * Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in

part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do. * * " 328 U.S. at 220, 222, 223, 224, 66 S.Ct. at 985.

The Supreme Court rested Thiel on its supervisory power, perhaps because it was unnecessary to rest it on the Constitution or perhaps to point the way for state courts.[40] Nevertheless, Thiel is a strong case for petitioners. It was a civil case with no racial overtones. Moreover, there were five members of the laboring class on the particular jury that decided the factual issues. The Court's decision to exercise its supervisory power is certainly not inconsistent with recognition of the exclusion of wage earners as unconstitutional. In Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469, the Court said: "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper sources of jury lists, *so long as the source reasonably reflects a cross-section of the population* suitable in character and intelligence for that civic duty."

**40.** It has been suggested that the Supreme Court's supervisory power enables it to "reconcil[e] the conflicting desires of the federal judiciary to improve standards for the protection of individual rights while exercising the self-restraint appropriate to constitutional adjudication and the delicate balances of the federal system". Note, the Supervisory Power of the Federal Courts, 76 Harv.L.Rev. 1656, 1666 (1963). The Court also exercised its supervisory power in Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181. Citing *Thiel,* the Court held that the systematic exclusion of women from federal jury panels was an improper departure from statutory standards, because all-male panels do not represent a cross-section of the community. As in *Thiel,* the Court's language seems to extend the holding beyond the mere application of supervisory power. For example, "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of the court". 329 U.S. at 195, 67 S.Ct. at 265. This is the language of Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164 and Strouder v. West Virginia, 100 U.S. 303.

The equal protection and the due process clauses of the Fourteenth Amendment merge in this case.

The equal protection clause prohibits a state from making arbitrary and unreasonable classifications.[41] Exemption of daily wage earners *as a class* is an unreasonable classification. (1) Their economic standing has, as *Thiel* teaches, no relationship to their competency as jurors. (2) As demonstrated by the Louisiana legislature's omission of daily wage earners from its list of groups exempt from jury duty, the community's need for their services as jurors is greater than its need for their uninterrupted services as workers and outweighs the financial hardships attached to jury duty. (3) Daily wage earners form such an extremely large definable segment of the community, 47 per cent of all Negro workers, that their exemption as a class would nullify any prospect of having jury venires representative of a cross-section of the community.

This exclusion also goes to the fairness of the trial. The "very integrity of the fact-finding process" [42] depends on impartial venires representative of the community as a whole. The undermining of the jury system's fact-finding process, the opportunity for unfairness, the risk that defendants who may be daily wage earners will be prejudiced by exclusion of jurors in the same class are dangers which would compel condemnation of the practice without the necessity of the court's finding actual prejudice affecting the outcome of the case. In this

situation, as in the straight-out exclusion of Negroes, "the degree of prejudice can never be known".[43] Nevertheless, the exclusion clearly prejudices defendants who are daily wage earners or Negroes and doubly prejudices defendants who are Negro daily wage earners. Unlike United States v. Flynn, the formal method of selecting jurors contained constitutional flaws.

The Court of Appeals of Georgia, while recognizing that the United States Supreme Court relied on its supervisory powers in *Thiel,* interpreted that decision in terms of the due process and equal protection clauses of the Fourteenth Amendment. In Allen v. State, 1964, 110 Ga.App. 56, 137 S.E.2d 711, the Court held that a *white* civil rights worker was deprived of due process and denied equal protection of the law by a jury system that excluded Negroes from jury panels.

The Court said, in *Allen:*

"We are of the opinion that any system that results in the consistent selection of jurors from a group or portion only of those available for service in that office, rather than from those available without discrimination, does not accord to any defendant the type of jury to which the law entitles him. 'The equal protection clause of the Fourteenth Amendment prohibits a state from convicting any person by use of a jury which is not impartially drawn from a cross-section of the community.' Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (Dissenting opinion) * * * But when

41. Morey v. Doud, 1957, 354 U.S. 457, 463–467, 77 S.Ct. 1344, 1 L.Ed.2d 1485; Yick Wo v. Hopkins, 1886, 118 U.S. 356, 373–374, 6 S.Ct. 1064; 30 L.Ed. 220; Eastman v. Yellow Cab Co., 7 Cir. 1949, 173 F.2d 874, 881; Huang-Thio, Equal Protection and Rational Classification, 1963 Pub.L. 412.

42. Linkletter v. Walker, 1965, 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601.

43. Hamilton v. State of Alabama, 1961, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d

114. In the racial *exclusion* cases relief has been granted without proof of actual prejudice to the defendant. Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Strouder v. West Virginia, 1879, 100 U.S. 303, 309, 25 L.Ed. 664. See Allen v. State, Ga. Ct.App.1964, 110 Ga.App. 56, 137 S.E. 711, indicating that a defendant is entitled *to a jury fairly selected from a cross-section of the community* regardless of whether he is a member of the class discriminated against.

a State uses a grand and trial jury the accused is entitled to those procedures which will insure, so far as possible, that the juries selected are fair and impartial. * * * When a State law provides for indictment and trial by a jury, due process of law, in our opinion, includes indictment and trial by juries selected in accordance with the established law, from a list of citizens representing a cross section of the community." Allen v. State, 1964, 137 S.E.2d at 715–717.

Two recent Maryland decisions bear on the question whether a state's good intentions may justify systematic exclusion of a class from the jury system. Maryland has always required jurors to show their belief in the existence of God. The effect, of course, was to exclude non-believers. In State v. Madison, 1965, 240 Md. 265, 213 A.2d 880, 885, the Court held, "[T]he exclusionary practice resulting in the failure of the jury to represent a cross-section of the community is condemned by the [due process and equal protection clauses] [of the] Fourteenth Amendment". The Court cited with approval Allen v. State. In *Madison,* the challenge came from a defendant who, as a member of the Apostolic faith, believed in the existence of God. In Schowgurow v. State, 1965, 240 Md. 121, 213 A.2d 475 the Court reached the same result on a challenge to the jury system by a Buddhist.

B. A benign and theoretically neutral principle loses its aura of sanctity when it fails to function neutrally. The effect of the exclusion of daily wage earners was to deprive the defendants of a jury of their economic and social peers. But it was much more. The disqualification of all daily wage earners, as it was obviously bound to do, disqualified far more Negroes than whites and, in final analysis, operated to exclude all but a token number of Negroes from the venires.

The 1950 census records for Orleans Parish show that all *male laborers* over fourteen years of age, excluding mine and farm laborers, totaled 19,014, of whom 13,556 were Negroes and 5,458 were whites.[44] The census records also show that there were 141,141 white males over fourteen in Orleans Parish and 58,313 Negro males over fourteen. Disregarding exclusion for good cause, if all male laborers as a class had been successfully excluded from jury service 22 per cent of the Negroes but only 3.8 per cent of the whites would have been excluded from jury service in the parish.

These figures are on the low side, for they refer only to male "laborers". The excluded class covered not only laborers but outside workers, artisans and, indeed, every person on a daily wage. The district court found that:

"Approximately thirty-seven per cent of the Negro work force in New Orleans were common laborers and approximately ten per cent of the total Negro work force were craftsmen such as bakers, blacksmiths, construction machinery operators, etc. Thus it will be seen that a large number of Negro prospective jurors would logically and necessarily be excused from jury duty in the regular administration of the State laws pertaining to the selection of juries, and this, without any systematic discrimination of any kind." United States ex rel. Poret and Labat v. Sigler, E.D.La.1964, 234 F.Supp. 171, 178–179.

Thus, 47 per cent of all Negro workers in New Orleans were excluded from the jury system.

■ It is common knowledge in New Orleans and certainly the Orleans Parish Jury Commissioners know that the systematic exclusion of daily wage earners from jury service must result in a disproportionately small number of Negroes in the jury wheel and in the final venires. The exclusion operates on several levels. First, the jury commissioners, using the city directory listing occupations, exclude all daily wage earners from the

44. The census figures for male laborers are only for those over fourteen years of age.

jury pool that is the source of names for the jury wheel, the general venire, thereby radically reducing the number of Negroes that might be drawn for the proposed venires. At the next level, if any daily wage earners show up on the proposed venires the district judges exclude these survivors from the final venires. The system inexorably operates to discriminate against all daily wage earners, but particularly against Negro wage earners.

The system was neutral, principled, and—foolproof: No Negro ever sat on a grand jury or a trial jury in Orleans Parish.

Nine years before Labat and Poret were tried, the Supreme Court of Louisiana put all of the state's jury commissioners on notice that they were under "a duty placed upon them by the constitutional provisions in question as construed and applied by the highest court in our land" that the complaint in the exclusion cases was "not with our [jury] statute which prohibits distinction on account of race or color but with the practical administration of the law * *." State v. Anderson, 1949, 205 La. 710, 18 So.2d 33. In that case the Court noted that the Negro population of Allen Parish was only 10 to 20 per cent of the population of Allen Parish, "and that considerably less than that percentage could qualify for jury service". "[N]ever in the thirty-one years of the parish's history had a negro ever served on a grand or petit jury". The court held that the commissioners had therefore "failed" in their duty; that "this evidence established a prima facie case" not rebutted by "general statements by the jury commissioners, the clerk of court, the sheriff and the registrar of voters" who "denied that they had discriminated against negroes."

The failure of the jury commissioners to take any action to compensate for the exclusion of Negro wage earners by seeking out additional names of potential jurors raises an inference of purposeful discrimination.[45] As Judge O'Hara pointed out in Dowels, Orleans Parish had a "large colored population * * * with * * * many of them qualified for grand jury service". Here the parties stipulated essentially what Judge O'Hara found as a fact in 1952:

"That the public schools of the Parish of Orleans between the years 1943 and 1953 graduated 19,651 Negroes from the elementary schools and 7,730 from the high schools.

That the parochial (Catholic) schools of the Archdiocese of New Orleans between the years 1935 and 1953 graduated 6,087 Negroes from the elementary schools and 2,172 from the high schools.

That Negroes, for fifty years or more, have served on juries in the U. S. District Court for the Eastern District of Louisiana, New Orleans Division.

That in the year 1950 there were numerous Negro males operating businesses in the City of New Orleans including 15 insurance companies that employed about 2,000 persons.

That [in 1950] there were 51,126 [Neproximately 1,500 Negro males employed by the U. S. Post Office Department; 700 Negro males employed as teachers; and approximately 1,027 in professional, technical and kindred employment.

That there have been institutions for the higher education of Negroes operating in New Orleans since 1870, at which time Straight University was founded, followed by New Orleans University in 1879; Xavier University in 1915; and Dillard University in 1935, formed by a merger of Straight University and New Orleans University.

That [in 1950] there were 51,126 [Negro] males between 20 and 64 years of age.

That the median years of education completed by the Negro segment of

45. See footnote 31.

the 1950 population in New Orleans was 6.5 years.

That in the year 1952, there were 28,005 Negroes registered to vote in the Parish of Orleans."

Certain other statistics have a special relevancy to the number of Negroes in the parish eligible to serve on juries. See Appendix A. In 1950 64 per cent of the non-white population had more than four years schooling. Table 4. Under Louisiana law (LSA–R.S. 15:174 (194)), there were only 444 Negroes exempt because of their occupation. This compares with 9,132 whites or 6.99 per cent exempt from jury service. Table 5, Appendix A.

There is an analogy between the instant case and Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110. In that case an Alabama statute redistricted, gerrymandered, the City of Tuskegee. The obvious effect was a twenty-eight-sided city that fenced off most of the white citizens from former Negro citizens. The Court read into the statute purposeful discrimination. Here the exclusion of daily wage earners, barring 47 per cent of the Negro work force, coupled with the commissioners' failure to seek additional Negroes for the general venire made it impossible for Negroes to reach the jury box in criminal cases in Orleans Parish. Instead of the State's coming forward with an acceptable explanation for the exclusion of Negroes, the State has proved facts that give rise to an inference of "purposeful discrimination" on the part of the jury selection officials, within the legal sense

of those words. "The Jury Commissioners and other officials responsible for the selection of this panel were under a constitutional duty to follow a procedure— 'a course of conduct'—which would not operate to discriminate in the selection of jurors on racial grounds". Hill v. State of Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559. Like the discrimination in Hill v. State of Texas, the "[d]iscrimination [in Orleans Parish] arise[s] from the action of commissioners who exclude all Negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve." 316 U.S. at 400, 62 S.Ct. at 1161. See Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1.

C. Louisiana, like most states, exempts from jury duty certain occupational groups such as public officials, doctors, firemen, policemen, and others. The legislature has decided that for the good of the community men engaged in these occupations should not have their work interrupted by jury service. But the legislature has not seen fit to exempt, *as a class*, "outside" workers, manual laborers, and earners paid a daily wage.[46]

The Louisiana district courts have extensive judicial discretion to excuse individuals but not classes from jury service.[47] State v. Dorsey, 1945, 207 La. 928, 22 So.2d 273. The scope of this authority is limited to deciding "the competency of jurors in particular cases" of "physical infirmity", "relationship", or "incompetency to sit upon the trial of any particular case".[48] Unlike 28 USC § 1863,

---

46. See footnote 37 for LSA–R.S. 15:174.

47. "While there is ample precedent for conferring on a court or judge power to 'excuse' individual jurors, there is no precedent known to the writer for conferring on a court or judge power to determine what classes of persons should be relieved of the burdens of jury service." Blume, Jury Selection Analyzed, 42 Mich.L.Rev. 831, 859 (1944).

48. LSA–R.S. 15:172, establishing the qualifications for jury service provides, in

pertinent part: " * * * that the district judge shall have discretion to decide upon the *competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.*" LSA–R.S. 15:192 reads: "The jury commissioners for the Parish of Orleans shall qualify all persons before their selection as jurors, but the judges of the several district courts shall have the right to decide upon the competency of jurors."

financial hardship is not a ground for exemption; only hardship because of age or physical infirmity. And, as Article 174 expressly states, "the exemption shall be personal" and is not a ground for challenge. State v. Smothers, 1929, 168 La. 1099, 123 So. 781; State v. Ross, 1947, 212 La. 405, 31 So.2d 842.

It is significant that notwithstanding the long existence of the practice in Orleans Parish of excluding daily wage earners, the revised Louisiana Code of Criminal Procedure, just enacted by the Louisiana legislature, contains no disqualification, exclusion, or exemption of prospective jurors who are daily wage earners. Nor is there an exemption of jurors for financial hardship. The Louisiana legislature apparently regards jury service, as the Supreme Court regarded it in *Thiel*, a duty to be fulfilled regardless of loss of earnings:

> "Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconveniency or decreased earning power." Thiel v. Southern Pacific Co. supra, 328 U.S. at 224, 66 S.Ct. at 987.

### IV.

■ We hold that the petitioners made out a prima facie case. In 1953 and for five years before, in the Parish of Orleans the method of selecting juries failed to meet the constitutional standards adopted by this Court and the Supreme Court. The record shows systematic exclusion of Negroes from the Orleans Parish jury system.

We hold that the state has failed to come forward with an acceptable constitutional explanation for the longstanding disproportionately small number of Negroes on venires and the resulting total absence of Negroes on grand and petit juries. The systematic exclusion, as a class, of all manual laborers, outside workers, artisans, and earners making a daily wage deprived the petitioners of an impartial jury, a cross-section of the community, in violation of the due process and the equal protection clauses of the Fourteenth Amendment.

The vice in the method of selecting jurors infected the entire jury system in the parish. Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 and Davis v. Davis, 5 Cir. 1966, 361 F.2d 770. Since the petit jury and the grand jury venires were drawn from the same jury wheel "the lists from which the grand jurors were chosen were the product of the same unconstitutional course of conduct which resulted in discrimination in the selection of petit juries." Davis v. Davis, 1966, 361 F.2d 770 at 775.

The judgment of the trial court is reversed and the case is remanded with directions to issue the writ releasing the petitioners from custody on their present convictions and sentences, subject, of course, to reindictment and to retrial by the State. See Scott v. Walker, 5 Cir. 1966, 358 F.2d 561; Davis v. Davis, 5 Cir. 1966, 361 F.2d 770.

### APPENDIX A

Counsel for petitioners submitted the following tables, based on the record, to show that an adequate non-white jury population existed in Orleans Parish in 1953.

Table 1: Male population between twenty-one and sixty-five years of age of Orleans Parish by Race for 1940, 1950, 1960, and 1953.

| Year | White | Non-White |
|------|-------|-----------|
| 1940 | 142,209 | 40,113 |
| 1950 | 116,269 | 46,287 |
| 1960 | 104,209 | 50,412 |
| 1953 | 111,193 | 48,231 |

Data derived from Population Census U.S. Dept. of Commerce Bureau of the Census, 1940 2:3 Table 22, 1950 2:18 Table 33, 1960 1:20 Table 20.[1]

1. 1953 figures estimated from census figures for 1940, 1950, 1960 by use of three point Le Grange Interpolation Formula.

Table 2: Estimated proportion of the Male Population of Orleans Parish by Race in 1950 belonging to various categories.

| Subject | White | Non-White |
|---|---|---|
| Citizens [2] | 98.5% | 99.6% |
| Residents [3] | 94.6% | 97.9% |
| More than four years schooling [4] | 89.6% | 64.7% |
| No occupational Exemption [5] | 93.0% | 98.7% |

Table 3: Total population of Orleans Parish over 21 by race for 1940, 1950, 1960, 1953.

| Year | White | Non-White [6] |
|---|---|---|
| 1940 | 331,411 | 94,985 |
| 1950 | 271,421 | 113,241 |
| 1960 | 257,495 | 125,752 |
| 1953 | 262,241 | 117,597 |

Table 4: Estimated proportion of the population of Orleans Parish by Race in 1950 belonging to various categories.[7]

| Subject | White | Non-White |
|---|---|---|
| Citizens [8] | 98.55% | 99.65% |
| Residents [9] | 94.6% | 97.9% |
| More than four years schooling [10] | 89.9% | 67.0% |
| No occupational Exemption [11] | 93.0% | 98.7% |

According to LSA–RS 15:174 (Code of Criminal Procedure), certain persons are exempt from Grand and Petit Jury service. If attention is confined to Sec. 3, alterations to the previously stated figures concerning the population eligible to serve as Grand or Petit Juror must be made as follows:

Table 5: Males over the age of 14, employed in certain categories exempt from Jury Duty under LSA–RS 15:174 Sec. 3, residing in the New Orleans Standard Metropolitan area in 1950. By Race.

| Category | White | Negro |
|---|---|---|
| Total | 131,225 | 42,966 |
| Lawyers & Judges | 966 | 3 |
| Physicians & Surgeons | 1,478 | 48 |
| College Presidents, Professors & instructors | 444 | 28 |
| Dentists | 333 | 16 |
| Pharmacists | 413 | 20 |
| Firemen, Fire Protection | | |
| Salesmen & Sales Clerks (manufacturing and wholesale excluding retail clerks) | 4,036 | 49 |
| Teachers | 638 | 276 |
| Total in exempt categories | 9,182 | 444 |
| % in exempt categories | 6.99% | 1.03% |

Source: 1950 Census 2:18 Table 77

Table 6: Proportion of non-whites in various populations.

| Population | Proportion (N/W+N) |
|---|---|
| **Eligible for Jury Service** | |
| Males only 1953 | 25.8% |
| Both sexes 1953 | 27.0% |
| Males only 1950 | 24.4% |

2. Citizens derived from 20% sample 21 and over, according to sex, in Orleans Parish in 1950. 1950 Census 2:18 Table 55.

3. Proportion of residents is estimated from place of residence in 1949 against 1950 for 20% sample of total population one year and over of Orleans Parish in 1950. 1950 Census Bulletin P–D36 Tables 1 & 4, and from 1950 Census 2:18 Table 33.

4. Schooling figures obtained from 20% sample according to sex of population of Orleans Parish in 1950, 25 years and over. 1950 Census 2:18 Table 65.

5. See Table 5.

6. Other Races 0:5%.

7. Table of the Binomial Distribution, Harvard University Press, Cambridge, Mass. 1955.

8. Note 2 supra.

9. Note 3 supra.

10. Note 4 supra.

11. Note 5 supra.

Commissioners'
Proposed Venire

| | |
|---|---|
| Jan. 1948 thru 3/53 | 6.2% |
| sub-sample undetermined | 6.0% |
| Nov. 1952 thru 3/53 | 4.9% |

**Final Venire**

| | |
|---|---|
| Jan. 1948 thru 3/53 | 3.7% |
| sub-sample race undetermined | 1.7% |
| Nov. 1952 thru 3/53 | 3.1% |

GEWIN, Circuit Judge (dissenting):

This case, involving one of the most heinous crimes ever committed in the rich and varied history of New Orleans, Louisiana, has been lost in the "nice, sharp quillets of the law."[1] I respectfully dissent, and in doing so challenge the interpretation of the facts, the reasoning and the legal conclusions applied to the facts in the majority opinion. I do not disagree with the abstract legal principles discussed, but the record does not support the facts found in the opinion; and therefore, the application of such legal principles to the facts found results in error.

A careful analysis of the opinion will clearly demonstrate that there has been a serious misconception of the issues we are called upon to decide, a misinterpretation or failure to accord proper weight to certain salient facts and an inaccurate interpretation of the prior decisions in the case. Moreover, a close scrutiny of the history of the case presents in bold relief a typical array of current tactics too often employed by criminal defendants,[2] bordering upon if not actually constituting oppression and harassment of an important witness for the prosecution; an unmerciful attack on counsel and court alike; the assertion of issues which can best be disproved by witnesses who are now dead; a shifting of issues and the assertion of new issues after losing on the ones first asserted;[3] a strong and venomous condemnation of state and sometimes local federal courts; the claim of newly discovered evidence; and the allegation that conviction was based on coerced and fraudulently obtained evidence.

Nothing herein said is meant to relate to the question whether the law providing for capital punishment in aggravated rape cases is good or evil for the residents of the State. That decision must be

---

1. Shakespeare, King Henry, VI, Part I, Act II, Scene IV.

2. No improper reflection is intended with respect to counsel who must present the issues which their clients assert and insist upon.

3. In footnote 5 of its opinion in Michel v. State of Louisiana (Poret and Labat v. State of Louisiana) 350 U.S. 91, 76 S.Ct. 158, 163, 100 L.Ed. 83; reh. den. 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831, the Supreme Court made this observation with reference to the attack on the grand jury:

"Not only may the prompt determination of such preliminary matters avoid the necessity of a second trial, but a long delay in its determination, such as here, makes it extremely difficult in this class of case for the State to overcome the prima facie claim which may be established by a defendant. Material witnesses and grand jurors may die or leave the jurisdiction, and memories as to intent or specific practices relating to the selection of a particular grand jury may lose their sharpness. Furthermore, a successful attack on a grand jury that sat several years earlier may affect other convictions based on indictments returned by the same grand jury."

In Labat v. Sigler, 162 F.Supp. 574 (E.D. La.1958) Judge J. Skelly Wright concluded:

"Petitioners, throughout this long litigation, have been represented by competent counsel of their own choosing. Their case has been considered by the Supreme Court of Louisiana and the Supreme Court of the United States on two separate occasions. Their case has been before the lower courts of the state and nation innumerable times. This court has, in effect, retried the petitioners for the offense of which they have been convicted. While it must be owned that the conviction of a Negro of rape of a white female in this state should be subjected to the severest scrutiny, on the basis of the record made here, this Court cannot say that these petitioners were denied due process of law."

**730**

made by the legislative branch of the state government of the State of Louisiana. Furthermore, we must consider the case with the realization that we have no power to pardon, or to exercise executive clemency.

## I. The Issue

The only issue [3a] before us is succinctly and clearly stated in the per curiam opinion of the Supreme Court, United States ex rel. Poret and Labat v. Sigler, 361 U.S. 375, 80 S.Ct. 404, 4 L.Ed.2d 380, in the following language:

"The judgment is vacated and the case remanded to the District Court for disposition of the question *whether members of petitioner's race were deliberately and intentionally limited and excluded in the selection of the petit jury panels, in violation of the Federal Constitution.*" (Emphasis added.)

There should be no argument about the fact that the question we are to determine is whether there has been a Federal Constitutional infringement with respect to *deliberate* and *intentional* limitation and exclusion of the petitioner's *race* in the selection of *petit* jury panels. The majority opinion does not deal with the issue of *deliberate* and *intentional* exclusion on account of *race* in the selection of

*petit* jury panels. It is concerned with grand juries, economic considerations in jury selection in civil cases, and omits consideration of evidence relating to the issue of deliberate and intentional exclusion.

The District Court for the Eastern District of Louisiana, United States ex rel. Poret and Labat v. Sigler, 234 F. Supp. 171 (1964), proceeded exactly in accordance with the mandate of the Supreme Court. It did not rely "on the ubiquitous fiction of waiver" quite as heavily as the majority indicates.[4] What the majority quotes from the opinion of the District Court would be characterized better as the District Court's summary of the holding of the Supreme Court in its first review of the case on certiorari to the Supreme Court of Louisiana. Michel v. State of Louisiana (Poret and Labat v. State of Louisiana) 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83; reh. den. 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831. I quote from the opinion of the District Court:

"They failed to make such objections timely, and hence, as *previously decided by the United States Supreme Court* in this very case, they are now deemed to have waived those objections." (Emphasis added.)

**3a.** While there are substantial areas of agreement in this dissent and in the opinion of Judge Bell concurring in the result, there are two material differences: (1) in my view Judge Bell's opinion, in dealing with the question of the exclusion of wage earners as a class, goes beyond the terms of the mandate of the Supreme Court which directed consideration of the race issue only. Michel v. State of Louisiana, supra; and (2) even if the economic issue of excluding wage earners is a proper subject for consideration, the record does not support a conclusion that there was a deliberate and intentional exclusion of such wage earners as a class. Certainly, the record does not support the conclusion that "all daily wage earners" were excluded. Rather, at best the record shows a liberal granting of excuses upon request for purely benevolent reasons in a system which did not provide for pay for jury service in the state court.

**4.** The majority opinion, in summarizing the holding of the District Court, emphasized that the District Court held "they are now deemed to have *waived* these objections." (Emphasis added by majority). The Court's opinion further concludes, in effect, that "the District Court's reliance on the ubiquitous fiction of waiver" was misplaced. Further stressing consideration of the waiver question, the majority asserts:

"The district court, however, relying on Michel (Labat-Poret), held that the petitioners, having failed to make timely objections to the jury, 'are now deemed to have waived those objections'. 234 F.Supp. at 175.

"The district court's error on this point and the states' frequent reliance on the doctrine of waiver in federal habeas cases demonstrate the need in this circuit for a close look at the Supreme Court's discussion of that doctrine in Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837."

Regardless of the consideration given to the waiver question by the District Court, it actually proceeded to a full hearing on the issue of the composition of petit jury panels. Again we quote from the District Court's opinion:

"Even though this Court is convinced that petitioners' objections to the make-up of the jury come too late, *nevertheless, out of an abundance of caution, detailed testimony was* taken concerning the composition of the petit jury involved and concerning the general practice in the past in the Parish of Orleans, State of Louisiana, in selecting and drawing juries. *A review of this testimony* convinces this Court that there is simply no merit to petitioners' contentions." (Emphasis added.)

## II. The Facts

### A. *Deliberate and Intentional Exclusion from Petit Jury.*

The Court extensively quotes Judge O'Hara who testified in the case. The most lengthy quotation, however, is from an opinion by him rendered in October, 1952. The opinion is unreported, but from the lengthy quotation it is clear that Judge O'Hara was dealing with *grand* juries. At least Judge O'Hara's opinion was designed to *correct* any abuse which existed in the peculiar manner of selecting grand juries in Orleans Parish prevalent at the time of his decision. It seems fair to say that the only question involved was not systematic exclusion "from Parish juries" but systematic exclusion from the grand jury. The action condemned by Judge O'Hara was the practice of the Orleans Parish judges in selecting *grand* juries under the old system. There is no mention of the jury selection officials who compile the general venire or jury wheel. Indeed, his opinion indicates the presence of Negroes in the jury wheel or on the general venire. His testimony showed that for 16 years prior to trial in this case the names of colored persons had been placed in the jury wheel and that colored persons constantly appeared on the general venire.

Here again we emphasize that the issue here involved does not relate to the grand jury but to "the selection of *petit* jury panels."

Accordingly, it seems more appropriate to quote the testimony by Judge O'Hara who appeared before the District Court as a witness on behalf of the petitioners with the expressed assertion by counsel for the petitioners that the evidence taken at the trial was for the benefit of both Poret and Labat. Judge O'Hara testified with respect to the method of selecting petit jurors in Orleans Parish for the actual trial of cases at the time of the trial of Labat and Poret and the period immediately preceding the trial. This fact makes his testimony unusually important. It is factual and not a theoretical, statistical estimate based on incomplete figures. We quote both from the testimony of Judge O'Hara given in open court and from his deposition. The following is a fair sampling from his testimony:

"Q. On hardship reasons, did you show any discrimination in releasing or failing to release anyone, white or black?

"A. No.

"Q. On account of their color?

"A. No. There was no discrimination whatsoever.

"Q. Now, the same way as far as the exemptions, whether a man was white or colored, if he said he was a schoolteacher or a municipal employee, or over the age of sixty-five, would it make any difference whether he was white or black?

"A. No."

\*　\*　\*　\*　\*　\*

"Q. Judge, what I am trying to do, and I am not trying to do anything except what is strictly one thousand percent correct, without taking advantage of anybody, in the stipulation it is shown, which is already a part of the record in this case, that a certain per-

centage as to how many people actually serve on the juries who are white or who are black. Now, I was going to ask and Mr. Gill anticipated this, in the question, when men were excused or challenged for cause or preemptorily challenged, no discrimination was made by the judges, including yourself?

"A. Oh no, oh no, oh no, oh no. If the juror, the prospective juror was challenged for cause and happened to be white or happened to be a negro, it wouldn't make any difference. It would be a question of what the cause was whether he would be excused for cause or not."

In speaking of a jury venire of approximately 150 persons, Judge O'Hara testified as follows:

"Q. Do you recall during the period that I mentioned, [1948–1953] whether or not it was general to find Negroes serving on the panels of veniremen for the petit jury in Orleans Parish?

"A. I would say yes. I would like to be a little bit better on the dates. Yes, the answer is yes. We had colored persons on the jury venire, I guess from the latter part of 1930.

"Q. From then on?

"A. Then on.

"Q. Where they there in any substantial numbers?

"A. Well, I would consider that there were a representative number of Negroes on the panels.

"Q. By a representative number, what do you mean?

"A. Well, I would state that in the City of New Orleans there are a whole lot more whites than [sic] are able and qualified to serve on juries than Negroes, and the number of Negroes represented the best effort of the Jury Commissioners to get Negroes on the panels.

"Q. Were there as many as one-third of the veniremen Negroes in any of the venires you handled during that period?

"A. No.

"Q. Would you say there were as many as 20% Negro?

"A. 20% would be about thirty.

"Q. One-fifth?

"A. No.

"Q. Would you say there were ever as many as 10%?

"A. Oh, yes.

"Q. At times?

"A. I would say there were never less than that; I would say that it would run about between 20 and 25.

"Q. —Negroes on the panel or the venire?

"A. Yes. It would run about 20, 22, 23, 18, 16. Some months there would be more than others.

"Q. Are these absolute figures, or percentage figures?

"A. From my own estimation, the colored people would run from about, I guess about 15 to 25, or maybe a little less than 25—22, 18.

"Q. You are talking about in absolute number, now, Judge?

"A. Yes.

"Q. The Judges had nothing whatever to do with the selection of petit jury veniremen; is that correct?

"A. That's right. That was just by the Jury Commissioners. Now, I would interest myself from time to time to see what the Jury Commissioners were doing, and it was always my observation that they were trying to get as many colored in the jury wheel as they could.

"Q. Did you ever make a statistical analysis of the number of Negroes that were included in the jury wheel?

"A. No, but I do know that the Jury Commissioners would ask Negroes to give them the names of other Negroes, and they would ask the members of the Negro corporations, insurance companies and whatever sources they thought they could get Negro jurors from. They would make inquiry. I am not talking about the administration; I am just saying from time to time I would

interest myself because I wanted to see what they were doing."

\* \* \* \* \* \*

"Q. Would you feel that a large percentage, or at least a significant percentage of wage earners that came to you with this excuse would probably receive, or, in other words, their excuse would be granted?

"A. Yes.

"Q. Did you find too that a large proportion of those persons who came to you with this request for excuse on the grounds of being wage earners or day workers were Negroes?

"A. Well, there were quite a few Negroes would ask to be excused for that reason. There was no discrimination made, I would like to say that. Whatever applied to the white would apply to the colored, and whatever applied to the colored would apply to the white.

"Q. But at the same time, you did find there was a significant percentage of the excuse for being wage earners which were made by Negroes?

"A. Yes.

"Q. —Veniremen?

"A. Yes. That was one of the great difficulties of getting colored people. For instance, a man would come up and say, 'I am a porter, I work for a small salary someplace and have got a family,' and not getting paid if he doesn't work.

"Q. If a man had come up and said that, given you that excuse, one man white and another man gave you the same excuse and he was colored, they would be treated alike?

"A. Yes."

\* \* \* \* \* \*

"A. I could say this, that I know of no plan or desire on anybody's part to minimize the number of Negroes in the wheel."

B. *The Stipulation.*

In Section II D of its opinion the majority asserts "[t]urning to the facts showing the operative effects of the Orleans Parish jury system, we find that many of the facts have been stipulated." The opinion does not then fully quote the stipulation, but immediately turns to certain statistical reports set forth in Appendix A to the opinion. Thereafter, in dealing with the subject there is a resort to mathematical calculations, percentages and other statistical data. Later in Section III of the opinion, to support its conclusion and finding of a "failure of the jury commissioners to take any action to compensate for the exclusion of Negro wage earners by seeking out additional names of potential jurors raising an inference of purposeful discrimination", there is a lengthy quotation from the stipulation. The stipulation was jointly signed by counsel for all parties and it states "that the following facts may be taken as having been proved and true or are the subject of judicial notice of the Court." [5] The stipulation was offered on behalf of Poret and Labat and it would seem to me they should be bound thereby. The majority opinion takes note of the stipulation and quotes certain portions of

5. The following is from the record:

"MR. SCHREIBER: On behalf of both relators, Clifton Alton Poret and Edgar Labat, we offer in evidence the stipulation, I guess we can identify it as Stipulation Number 1.

"THE COURT: Yes, all right, that is good, just Stipulation Number 1, because it is a joint offering.

"MR. SCHREIBER: Which is agreed to by the attorneys for all of the parties that are involved in this case, including the State of Louisiana.

"THE COURT: All right.

"MR. SCHREIBER: Also, Your Honor, I would like the record to show that any evidence that is taken in the trial of this cause also goes to the benefit of Clifton Alton Poret as well as Edgar Labat.

"THE COURT: I understand all of this evidence is to be offered by counsel, regardless of which of petitioners' counsel offers it, that it is to be offered in connection with both petitioners' claims, Clifton Alton Poret and Edgar Labat.

"MR. SCHREIBER. Yes, sir."

**734**

it at length in Section III. The sequence of the numbered items lifted from the stipulation and quoted in the body of the opinion is as follows: Items 10, 11, 12 (13 omitted), 14, 15. There is a failure to take proper note of the contents of Item 13. It is only set forth in a footnote. It appears to me that Item 13 is as important as any of the other items contained in the stipulation. It reads as follows:

> "13) That although prior to February, 1953, no Negro had ever served on a petit jury empaneled to try a negro in the Criminal District Court for the Parish of Orleans, since 1936, the Jury Commissioners for the Parish of Orleans had *certified negroes* as qualifying under the state law in petit jury venires *in numbers approximating 10% of the venire*." (Emphasis added.)

Item 13 of the stipulation and Judge O'Hara's testimony are not in conflict. The Judge indicated that at least 10% of the general venire were Negroes; the stipulation states approximately that number were Negroes. Under the practice, petit juries which actually served as trial juries were taken from the general venire, at least 10% of which was composed of Negroes.

The mathematical calculations set forth in Section II D of the majority opinion are confounded, confused and completely nullified by the percentage figure stated in Item 13 of the stipulation and by the testimony of Judge O'Hara which we have quoted above.

In spite of what the majority says about the reliance of the District Court on waiver, the District Court did go into the merits of the question whether there had been deliberate or intentional exclusion in the selection of the petit jury. A hurried glance at the District Court's opinion, 234 F.Supp. 171 at 178, makes this assertion obvious beyond any doubt. The District Court gives a full discussion of the facts and the reasons for its conclusion. It is simply not a fair appraisal of the opinion to state that it is based on waiver.

## C. *Deceased Judge and Deceased Lawyer.*

A great controversy has arisen in this case as to when Labat and Poret attacked the jury system and the number of Negro jurors appearing on the panels at the time. The majority opinion itself is rather confusing as to just when the attack took place as I will show later in this opinion. One thing is clear, however, the two most important witnesses who could testify about the subject were dead when Labat and Poret made their frontal attack during the last habeas corpus hearing before Judge West in the District Court. Death has locked the lips of these key witnesses and concealed the facts about which they could testify. There is no intimation as to what the testimony of Judge Fred Oser would have been if he had lived.

The deceased attorney, Mr. Mahoney, is given the questionable accolade of having caused a default characterized as "the inadvertence or mistake of an ill and aged court-appointed attorney." Moreover, he is indirectly accused of having committed a "venial sin" because of hindsight judgment as to the tactics he should have employed. I do not accept these accusations or conclusions. Mr. Mahoney was not known to the writer, but certainly his long record as an honored criminal lawyer who served in his profession for 50 years justifies some answer to the accusation out of sheer respect for his memory as a lawyer, if nothing else. The determination of the Supreme Court in Michel v. State of Louisiana (Poret and Labat v. Louisiana) 350 U.S. 91 at p. 101, 76 S.Ct. 158, 164 seems to be appropriate and sufficient. After accepting the holding of the trial court and the Supreme Court of Louisiana that there was no showing of a lack of effective counsel, the Supreme Court concluded that there was little support for the accusation against Mr. Mahoney. The court noted that Mr. Mahoney was a well-known criminal lawyer with nearly 50 years experience, and it concluded that there was *no evidence* of incompetence. Speaking on this question and also the question of a failure to

make an immediate attack on the grand jury, the Supreme Court asserted in footnote 7:

"On the contrary, Mr. Mahoney, since deceased, was recognized as an exceptionally qualified counsel. On June 1, 1955, the legal profession in New Orleans honored him with a plaque which cited him as 'an astute and honored criminal lawyer who has ever been mindful of the oath administered him 52 years ago to uphold the law and to guarantee to each accused his day in court.' As pointed out in the State's brief, whether or not to make *an immediate attack on the grand jury* was entirely within the discretion of Mr. Mahoney and *there were valid reasons for not doing so at the time.*" (Emphasis added)

**D.** *Time of Attack on the Jury System.*

In the beginning the opinion states that the petitioners "consistently and unsuccessfully" asserted that they were denied a fair trial resulting from the systematic exclusion of Negroes. Later, however, the majority opinion concludes that after reading old briefs and records the attack was not acutally made until the habeas action was filed in 1957 and that the failure of counsel to do so was a "venial sin".

Once again it is necessary to emphasize that we are not dealing with a *grand* jury question here. The mandate calls for consideration of exclusion "in the selection of *petit* jury panels." Evidently, the Supreme Court concluded that the grand jury question had been settled [6] because the mandate of the per curiam remand

mentions "petit jury panels" only. Actually, that issue was settled when the case was first reviewed on writs of certiorari to the Louisiana Supreme Court, Michel v. State of Louisiana, supra. Judge West, as well as Judge Wright, took note of this fact as is obvious from Judge West's opinion in 234 F.Supp. at p. 174 where he quotes from the opinion of the Supreme Court.

It is apparent that the Supreme Court considered the Louisiana Statute, Art. 202 so strongly criticized by the majority, as a valid state statute of limitations. A statute of limitations cuts both ways. As stated by the Supreme Court in Pendergast v. United States, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368:

"Every statute of limitations, of course, may permit a rogue to escape."

On the other hand, important policy considerations are involved,[7] as the Court pointed out in Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945):

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. (Citing authority) They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay.

6. Judge J. Skelly Wright in his opinion, Labat v. Sigler, 162 F.Supp. 574 (1958), stated:
"The Supreme Court of the United States also affirmed the conviction after granting a writ of certiorari limited to an attack on the grand jury venire. Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83."

7. The following is from the opinion in Michel v. State of Louisiana (Labat and Poret), supra:
"Poret's case affords a perfect illustration of the necessity for prompt de-

termination of claims such as he raises here. Five years have now elapsed since the crime was committed, and the delay has been largely caused by Poret's own actions. Even if available, and memory permitted, the victim and chief witness would be reluctant to retell the sordid story of her unfortunate experience. Poret's conviction *by a petit jury whose composition he did not attack has been affirmed* by Louisiana's highest court and no constitutional challenge is made here to the fairness of that trial." (Emphasis added.)

They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate."

E. *Attack on Witness, Coerced Testimony, New Testimony.*

The majority opinion points out that the application for habeas corpus in the United States District Court for the Eastern District of Louisiana filed September 18, 1957, was based on newly found evidence that a witness' testimony was perjured and coerced. Footnote 11 of the opinion also states that in addition the petitioners claimed that they had discovered a witness, one Elnora Henderson, who had not testified at the original trial, but who was now available. Her testimony would show that on the night of November 11, 1950 (the rape was alleged to have been committed early in the morning of November 12, 1950) she spent the entire night with Labat, that he was so drunk during the early morning hours of November 12 that she was unable to arouse him even though she massaged his body with ice cubes. It is difficult to see how such evidence or such a witness would be newly discovered; because if the alleged testimony were true, certainly Labat would have known about Elnora Henderson and where he actually was when he did awaken. He was a part of the newly discovered evidence and an actor on the scene.

In the first habeas corpus proceeding in federal court, Labat v. Sigler, 162 F. Supp. 574 (1958), it is interesting to note the position taken by the petitioners. As observed by Judge J. Skelly Wright, the conviction had already been affirmed by the Supreme Court of Louisiana, State v. Labat, 226 La. 201, 74 So.2d 333, and by the Supreme Court, Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83. In that application the petitioners claimed they were convicted on perjured testimony of Earl Howard, a disinterested state witness, which perjury was coerced by the police. That issue was neither raised nor passed on during the original state court trial. Judge Wright commented as follows with reference to the pressures that had been placed on the witness Howard:

"Unquestionably, as the evidence shows, he has been subjected to great pressures from persons seeking to help these petitioners since his testimony in the state court."

The Court concluded that there was no evidence whatever, aside from statements prepared by others for Howard's signature, that he had either committed perjury or was coerced into doing so by the police.

Nor was Howard the only witness involved. Judge Wright further stated:

"While Howard definitely was an important witness in the state's case against the petitioners, the testimony of Penedo and Miss Rajek was at least as important. Both specifically identified the petitioners, not only in the state court trial but in this court, as the two persons who had raped Miss Rajek. *Their credibility is unchallenged* except in so far as the possibility of human error is always present in the identification of persons in the circumstances in suit." (Emphasis added.)

In the circumstances, Judge Wright subjected the evidence "to the severest scrutiny," but he denied the writ.

### III. The Law

Returning again to the issue before us, namely, "whether members of the petitioners' race were deliberately and intentionally limited and excluded in the selection of petit jury panels," we turn to the most recent case decided by the Supreme Court, Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. Within the first page and a half of that opinion the Court sets forth the law bearing on the issue we must decide:

"Although a Negro defendant is not entitled to a jury containing members of his race, a State's *purposeful or deliberate* denial to Negroes on account of race of participation as jurors in the

administration of justice violates the Equal Protection Clause." (Emphasis added.)

\* \* \* \* \* \*

*"Nor is the constitutional command forbidding intentional exclusion limited to Negroes.* It applies to any identifiable group in the community which may be the subject of prejudices." (Emphasis added.)

\* \* \* \* \* \*

"But purposeful discrimination may not be assumed or merely asserted. Brownfield v. State of South Carolina, 189 U.S. 426, 23 S.Ct. 513, 47 L.Ed. 882; Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; Bush v. Commonwealth of Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354. It must be proven, Tarrance v. State of Florida, supra; Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497, the quantum of proof necessary being a matter of federal law."

The defendant in *Swain* was charged and convicted of the capital offense of rape. The jury venire in a capital criminal case usually contained about 100 jurors. After excuses and removals for cause the venire is reduced to about 75. It should be noted that in *Swain* there were six to eight Negroes on the venire, which would be around 10%. In the instant case the stipulation (Item No. 13) states there were approximately 10% on a venire of 150 jurors. Judge O'Hara's testimony indicates a slightly larger percent. The Court concluded in *Swain* as follows:

"Moreover, we do not consider an average of six to eight Negroes on these panels as constituting forbidden token inclusion within the meaning of the cases in this Court. Thomas v. State of Texas, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 412; Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Avery v. State of Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244. Nor do we consider the evidence in this case to make out a prima facie case of invidious discrimination under the Fourteenth Amendment."

The *Swain* case dealt with the issue of a *purposeful* and a *substantially effective* effort to deprive members of the Negro race any realistic opportunity to serve as jurors. See also Akins v. State of Texas, 325 U.S. 358, 405–406, 65 S.Ct. 1276; Thomas v. State of Texas, 212 U.S. 278–288, 29 S.Ct. 393, Fay v. People of State of New York, 332 U.S. 261 at 284, 67 S.Ct. 1613, 91 L.Ed. 2043; Brown v. Allen, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469. In Brown v. Allen, Negroes comprised only 7% of the names on the jury list in a county where they comprised 38% of the eligible taxpayers. The Court held the discrimination was caused by an economic factor rather than a racial one and hence it found no constitutional violation. In this case the colored population was approximately 31–32% and as stated, the evidence clearly shows that Negroes composed approximately 10% of the petit jury panels.

It has long been the rule that a person asserting an intention to exclude and thus attacking the jury selection procedure has the burden of proving such intent. Smith v. State of Mississippi, 162 U.S. 592, 600, 16 S.Ct. 900; Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402; Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338; Fay v. People of State of New York, supra, 332 U.S. at 285, 67 S.Ct. 1613.

The majority goes to great length in discussing economic factors involved. Heavy reliance is placed on the civil case of Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984. More appropriate authority is Brown v. Allen, supra, where an economic factor was involved in a criminal case in which racial discrimination was claimed. If the ratio of 7% Negroes on the jury list as compared with 38% of the eligible taxpayers from which the jury list was composed did not constitute constitutional wrongdoing where an economic factor was involved, it is difficult for me to conclude that there has been constitutional infringement in the instant case where the more favorable

figures of 10% on the petit jury panels must be compared with 31–32% of the population. Moreover, the *Thiel* case did not deal with the question of constitutional infringement, and the racial question was not involved; the Court was exercising its supervisory power rather than passing on a fundamental constitutional issue.

## IV. Conclusion

Pretermitting any further discussion of the question when the attack on the jury system was made, the matter of waiver, and all the other elements in the case, it is clear to me that the petitioners have not proven deliberate and intentional exclusion of Negroes in the selection of petit jury panels. Their evidence was vague, indefinite and uncertain. It was chiefly theoretical, statistical proof. The District Court was amply supported by the evidence in concluding that the race or color of 44% of the total number of names appearing on the venires was not determined. It is obvious why the actual attack on the petit jury panels came only after all other efforts failed, and finally that attack also failed. The facts show that for years there had been substantial numbers of Negroes on the petit jury venire, and there was no substantial evidence of intentional and purposeful exclusion. At best, the initial attack did not rise above a loose allegation which was not supported by any evidence. The judgment of the District Court should be affirmed.

Justice tempered with mercy plus a fair trial, even for those charged with the most revolting crimes, are principles deeply embedded in the American system. Courts and law enforcement agencies should never deviate from those concepts.

It seems appropriate to observe, nevertheless, that this nation has spent much time and exercised great efforts throughout its history to persuade victims of heinous crimes to let the courts determine guilt and fix punishment. Great success has been achieved. Mob violence, "lynch law", and the pistol and gun of the avenger have ended in large measure. There is a growing alarm, however, over the rapid increase of crime and the reluctance of citizens, victims and witnesses alike, to turn to the courts for help. See Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (dissenting opinion) where Mr. Justice White stated:

"The most basic function of any government is to provide for the security of the individual and of his property. Lanzetta v. State of New Jersey, 306 U.S. 451, 455, 59 S.Ct. 618, 619, 83 L. Ed. 888. These ends of society are served by the criminal laws which for the most part are aimed at the prevention of crime. Without the reasonably effective performance of the task of preventing private violence and retaliation, it is idle to talk about human dignity and civilized values."

\* \* \* \* \* \*

"Secondly, the swift and sure apprehension of those who refuse to respect the personal security and dignity of their neighbor unquestionably has its impact on others who might be similarly tempted."

How long will citizens exercise appropriate restraint while the courts continue to indulge in delay and return to society the ruthless rapist, the stealthy nighttime burglar, the cold blooded murderer, the sex fiend or members of organized narcotics gangs? The case of the criminal often becomes a cause celebre resulting in unreasonable public expense, and in some respects, he becomes the hero and player of the leading role in a fantastic display of court procedures that continue for years upon years. The victims are forgotten. Some are dead! A proper balance between the protection of society and the rights of the individual charge with crime must be achieved.

It is now commonplace to hear unrestrained criticism of police and law enforcement officials. Lawyers who are appointed to represent defendants are charged with professional neglect and misconduct. If the defendant is convicted, the lawyer is accused of furnishing ineffective representation. The accusa-

tion is spread upon the records of the court. The lawyer then becomes embroiled in the defense of his own actions in doing his best to represent the accused defendant, even under court appointment. Sometimes his reputation for honesty is placed in jeopardy. In some cases his professional reputation is scarred and blotted.

In my view, remembering always the rights of the accused, the times demand a close examination of the entire system by which criminals are tried, and from it there should be cut away some of the evident soft sentimentality which at times seems to be prevalent, and in its place a fair degree of firmness and austerity should be substituted in dealing with defiant, dangerous and diabolical criminals.

BELL, Circuit Judge (concurring in the result):

I concur in the result for the reason that the exclusion, as a class, of all daily wage earners deprived appellants of an impartial jury in violation of the due process and equal protection clauses of the Fourteenth Amendment. My concurrence, unlike the majority opinion, is not based on race. This special opinion is filed to outline my disagreement with the race premise of the majority opinion, and also for cautionary purposes with respect to some of the language of that opinion.

It is necessary first to separate the wheat of the majority opinion from the chaff. Three points may be taken as settled. One, this is not a grand jury case although a large portion of the majority opinion is focused in that direction. The Supreme Court ruled against appellants on the grand jury question years ago. Michel v. State of Louisiana, 1955, 350 U. S. 91, 76 S.Ct. 158, 100 L.Ed. 83. Two, the District Court did not rest its decision merely on waiver. It decided the case alternatively on waiver and on the merits. Third, the petit jury question was not asserted in the Supreme Court on the first appeal. The court was at pains to point out that no attack was made on the composition of the petit jury. Instead, that question was apparently saved under the

piecemeal appeal practice now prevalent to be raised if need on another day. On the question of piecemeal appeals see Paige v. Potts, 5 Cir., 1965, 354 F.2d 212, Footnote 2; and cf. Marion v. Harrist, 5 Cir., 1966, 363 F.2d 139, where at least one constitutional question was held out for future use.

The only question for decision, assuming no waiver, and waiver is never a popular doctrine in a death case, is whether Negroes were deliberately and intentionally limited and excluded in the selection of petit jury panels in violation of the Constitution. This question was mandated to the District Court by the Supreme Court in 1960, over ten years after the commission of the crime in question.

The majority holds that appellants made out a prima facie case by showing a system which had not produced Negro jurors who actually served on a grand or petit jury for several years up to the time of trial and which in any event produced only a token number of prospective Negro jurors. The evidence also disclosed a system whereunder daily wage earners and all outside workers were excluded from the overall jury list from which petit jural panels are drawn. ·The latter disclosure, in my judgment, made out a prima facie case, which was not overcome. However, I do not agree that the evidence made out such a case with respect to exclusion or limitation based on race.

The majority places great stock in the fact that no Negro actually served, on a grand or petit jury during the period in question. Such reasoning conflicts with Swain v. State of Alabama, 1965, 380 U.S. 203, 85 S.Ct. 824, 13 L.Ed.2d 759 and our recent *en banc* decision in Scott v. Walker, 5 Cir., 1966, 358 F.2d 561, 571, where we said:

"* * * nor does the Constitution require that any particular panel of jurors in a criminal trial include members of the race of the accused person. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824. * * *"

Of course, it may be that the fact of no actual jury service by a Negro is sub-

mitted as a factor in the total proof picture relating to exclusion or limitation based on race and not as a conclusionary fact. Nevertheless, it is a slender reed on which to base a finding of deliberate and intentional limitation and exclusion of Negroes in the selection of petit jury panels in light of the undisputed evidence that each of the 150 person jury panels included at least ten per cent Negro representation. This was a stipulated fact and the testimony of Judge O'Hara indicates an even higher percentage over a sustained period of time. In line with other testimony in the case that a smaller percentage of Negro population was qualified for jury service than the white population, this minimum of ten percent representation as compared to a thirty two per cent Negro population does not make out deliberate and intentional limitation or exclusion of Negroes from jury service.

It does appear that the 150 person panels were usually reduced by the trial judges to a final venire of approximately 75 persons and that the percentage of Negroes on these final venires was only slightly over three per cent. However, the reduction in Negro representation came about through excusing jurors who asked to be excused because of a hardship, or simply by letting those of the 150 serve who volunteered to serve. Apparently only about one half of the 150 jurors on each panel were needed for actual service so many could be excused. This practice is hardly a basis for a finding of deliberate and intentional limitation or exclusion of Negroes from jury service.

On the other hand, I do think the practice of excluding all daily wage earners from jury service violates the requirement that a jury list be comprised of a fair cross-section of a community. Theil v. Southern Pacific, 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1183, makes such a requirement clear in federal cases. Fay v. People of State of New York, 1946, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043, points out that the reversal in Theil rested on the supervisory power of the court of federal trials. Then, the court, in Brown v. Allen, 1952, 344 U.S. 443, 73 S.

Ct. 397, 97 L.Ed. 469, while adhering to its Fay position that rules dealing with the selection of federal juries are not applicable in state court proceedings, nevertheless said:

"Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty. * * *"

Implicit in the rationale of Fay v. People of State of New York and Brown v. Allen, is the teaching that the equal protection and the due process clauses of the Fourteenth Amendment are violated by the exclusion of a class where the result is a jury list that does not reflect a fair cross-section of the community.

This fault in the Orleans Parish jury system is not based on race except insofar as there happened to be more Negro daily wage earners than white but it is a fault of such a magnitude as to indicate an improper jury system. This is not to say that there was not a reason for the exclusion. Jurors in Orleans Parish are not paid and the exclusion of this class of jurors was for the practical reason that jury service would amount to a financial hardship and the tendency in the end would be to excuse jurors in this class anyway. Nevertheless, such a blanket exclusion cannot be permitted whatever the reason and the case is due to be reversed because of this fault.

The mandated question was to determine whether there was a deliberate and intentional limitation and exclusion of Negroes contravening the federal Constitution. My own conclusion goes outside that question but I doubt that we are limited to a narrow reading of the question and the scope of the question would include a finding of a defective system based on the exclusion of the wage earner class.

A word of caution is appropriate with respect to some of the other language in the majority opinion. As concerns the waiver question, I would emphasize the

deliberate by-pass doctrine of Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 387. Defense counsel should not take the court's derogation of the waiver doctrine where applied to federal constitutional rights in federal habeas courts as a license to forego challenging jury systems and thereby provide a built-in error in the event the first trial results in a conviction. Moreover, trial courts should be alert to avoid just such situations by requiring counsel to make a choice in the first instance as to whether the jury system is to be challenged.

The opinion of the majority tests the disparity between non-white population and the number of Negroes on the jury list without regard to literacy. As my dissent in Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34, makes clear, and as I have stated here, I think the disparity should be tested in light of a reasonable literacy standard. The comparison should be made on the basis of the percentage of the Negro population available and qualified for jury service as against the percentage of Negroes on the jury list. In this connection, there is some mention in the majority opinion of a literacy standard based on a fourth grade education. This contemplates jury service by functionally illiterate persons. I do not think this is an adequate educational standard in a country dedicated to education and where all states save one have compulsory education. The harm done to the jury system by the adoption of such a low standard would be incalculable. Assuming that the right to jury trial under the Sixth and Seventh Amendments is a viable right, it could hardly be supposed that the right would not include a jury made up of jurors who could comprehend the issues, and who would have the capacity to resolve the issues. Such issues must often be resolved by sifting complex facts and by following difficult instructions on the appertaining law. How is this right to be vindicated where

a jury list includes illiterates? Voir dire questions might disclose illiteracy but at the risk of offending or destroying the dignity of the jurors. Seemingly no other protection would be available. See United States v. Henderson, 7 Cir., 1962, 298 F.2d 522, for an approved jury system where an eighth grade education standard was one factor considered by jury commissioners in selecting prospective jurors.

The majority relies on state authorities for the proposition that an entire jury system is infected where the list does not represent a fair cross-section of the community and thus finds that appellants have standing. This proposition, if not settled by the broad language of the Supreme Court in Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 2d 181, a federal jury case resting on the supervisory power, was at least forecast. The court there said that reversible error in such event does not depend on a showing of prejudice in an individual case. The due process clause of the Fourteenth Amendment guarantees a fair trial, Fay v. People of State of New York, supra, and cases there cited, and a fair trial envisions a jury list which reflects a fair cross-section of the community. Brown v. Allen, supra. Having these authorities in mind, I have no difficulty in concluding that the appellants have standing to complain of the wage earner class exclusion.

Having joined in the reversal, it may be well to add that little is apt to come of new indictments. The crime was committed in 1950, appellants were tried in 1953; and it is unlikely that adequate proof would be forthcoming under the facts of this case for conviction at this late date. The Supreme Court was of this view in 1955. See Michel v. State of Louisiana, supra. This is an example of a near breakdown in our system of criminal justice brought about by a defect in the jury process, and long delays in the appellate process through the indulgence of the piecemeal appeal approach.[1] Persons

---

1. As examples of unusual delay, see the following cases heard en banc along with this case: Scott v. Walker, 5 Cir., 1966, 358 F.2d 561, appellant sentenced to death in 1958 for rape; Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, appellant sentenced to fifty years in 1959 for rape; Davis v. Davis, Governor, 361 F.2d 770, sentence of death in 1959 for the murder of a police officer.

charged with grave crimes may go free. Society will be the loser. Paraphrasing the famous dictum of Justice Cardozo in People v. DeFore, 1926, 242 N.Y. 13, 150 N.E. 585, the criminals may go free because the courts have blundered.

It may be that administration of criminal justice now exceeds the capacity of our court system. There is no doubt that the administration of the jury system presently exceeds the capacity of the court system. Our en banc decisions in this case and in Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34, and Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, make this clear. I do not think it an excessive statement to say at this sitting that it is unlikely that there is a jury commission or trial court, state or federal, in this circuit which possesses the prescience to compile a jury list immune from successful attack on either racial or fair community cross-section grounds through the use of a mathematical approach. What may appear as a proscribed imbalance can be easily shown by using percentages. And, of course the decisional process is much simpler where we apply only a mathematical test, but a mathematical straight jacket instead of balanced reasoning on all the relevant facts, has not been the way or the strength of the law. Swain v. State of Alabama, supra, is a fair and common-sense approach to the jury problem and I think it unfortunate that a lower court departs, as the majority does here on the race question, from the sound view there expressed.

Moreover, it is imperative that the court adopt some new approach to make certain that all possible errors are asserted in the first instance to avoid piecemeal appeals and the resultant interminable delays. The courts may have to adopt a *parens patriae* approach as guardians of the court system to make certain that possible errors are not held out for future use.

COLEMAN, Circuit Judge:

I join in the specially concurring opinion of Judge BELL.